494 P.3d 693
The PEOPLE of the State of Colorado, Complainant,
v.Angelique LAYTON, #36480, Respondent.
Case Number: 19PDJ056 (consolidated with 20PDJ030)
Office of Presiding Disciplinary Judge of the Supreme Court of Colorado.
May 14, 2021 OPINION AND DECISION IMPOSING SANCTIONS UNDER C.R.C.P. 251.19(b)
WILLIAM R. LUCERO, PRESIDING DISCIPLINARY JUDGE
Angelique Layton, who also goes by Angelique Layton Anderson ("Respondent"), committed misconduct in four separate matters. In one client matter, she acted incompetently by failing to timely petition for review of a magistrate's order. She also threatened opposing counsel with a disciplinary complaint to gain an advantage in a domestic relations matter. In another case, Respondent failed to exercise basic competence when she ignored rules of civil procedure and rules governing the discovery process. In a third client matter, Respondent acted incompetently by failing to follow rules of procedure, by failing to inquire who had authority to speak for and make decisions on behalf of her client, and by failing to conduct basic investigation into the factual and legal basis for a complaint she brought on her client's behalf. In that same matter, she took direction from a third party while neglecting to consult with her client about the matter; failed to provide her client with a fee agreement or any kind of writing describing her fee; impermissibly revealed information related to her representation of the client; filed a frivolous and groundless lawsuit; failed to make efforts to comply with legally proper discovery requests; and prejudiced the administration of justice. Finally, in her disciplinary proceeding, Respondent falsified an expert rebuttal report by knowingly misrepresenting that her expert authored and signed the report, even though the expert never wrote, reviewed, or signed the report. This misconduct, taken together, warrants suspension for three years.
I. PROCEDURAL HISTORY On August 6, 2019, the Office of Attorney Regulation Counsel ("the People") filed with the Office of the Presiding Disciplinary Judge ("the PDJ") a sixteen-claim complaint in case number 19PDJ056.1 Through her then-counsel Manuel J. Solano, Respondent answered the complaint on September 20, 2019.2 A hearing was set for March 31 through April 3, 2020. Solano withdrew in December 2019, and John S. Gleason, entered his appearance for Respondent on May 19, 2020.
In March 2020, at the People's request, the PDJ continued the hearing so that the People could investigate new allegations of misconduct arising out of discovery in case number 19PDJ056. On May 21, 2020, the People filed a second complaint against Respondent, alleging five claims pleaded under case number 20PDJ030. Respondent answered that complaint on June 11, 2020.
The PDJ consolidated the two cases and reset the hearing for November 2 through November 6, 2020. In September 2020, the People moved to dismiss Claims I and II in case number 20PDJ030 (alleging violations of Colo. RPC 3.3(a)(1) and Colo. RPC 3.3(a)(3), respectively); the PDJ granted the motion and dismissed those claims on September 21, 2020. In late October, the PDJ again continued the hearing, this time at Respondent's request due to a death in her family. The hearing was reset for March 15 to 19, 2021, to take place remotely via the Zoom videoconferencing platform.
The PDJ presided over the March 2021 remote hearing; he was joined on the Hearing Board by lawyers James Brown and Margaret Cordova. Jane B. Cox and Erin R. Kristofco represented the People. Gleason appeared on behalf of Respondent, who also attended. The Hearing Board considered stipulated exhibits S1-S1853 and heard testimony from Devra Carmichael, Christopher Eddlemon, Judge Michelle Kline, Theodore Shih, Arthur Porter, Ghassan Nehme, Jason Huffer, Judge David Gilbert, Charlene Hunter, Jody Brammer-Hoelter, Dr. Charles Shuman, Dr. Michael Gendel, retired Magistrate Peter Stapp, Respondent, Judith Shively, Patricia Bentley, Patricia Anselmo, Nicole Washington, Sarah Matthews, Lewis (Jack) Buck, and Tracy Hurtado.4 II. FACTUAL FINDINGS AND ANALYSIS 5 Respondent was admitted to practice law in Colorado on July 12, 2005, under attorney registration number 36480. She is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in this disciplinary proceeding.6 Respondent lives and works in Louisville, Colorado, and primarily practices domestic and family law.7 Carmichael Matter (Case Number 19PDJ056)
Jenifer Bentley (formerly known as Jenifer Eddlemon) ("Mother") and Christopher Eddlemon ("Father") filed for divorce in Adams County District Court in 2013. Father was represented by Devra Carmichael. In 2016, Mother hired Judith Shively, who represented Mother before Respondent took over as her counsel in September 2017. Shively recalled that Mother and Father, who together had five children, approached each other as though they were "at war," and the register of actions bears that out: according to Carmichael, at least 310 filings in the case have been submitted.8 In April 2017, before Respondent entered an appearance on the case, the parties attended a hearing on a motion that Mother had filed to restrict Father's parenting time. The presiding magistrate noted the "animosity" between the parents and described the situation as "horrendous."9 The hearing focused specifically on the parents’ interaction with their oldest son, C.E. The magistrate found that C.E., who had "real and ongoing issues" with Father, was on the runaway list, and that Mother "exacerbated" these ongoing issues by "allowing C.E. to do whatever the hell he wants to do," including simply leaving Father's house.10 The magistrate denied Mother's motion.
On June 9, 2017, the court held another hearing, this time to decide allocation of parental responsibilities and decision-making for several of their children, including C.E. As relevant here, the magistrate awarded Father sole parental responsibility and decision-making authority for C.E. and reduced Mother's parenting time with C.E. to once a week in a supervised therapeutic setting.11 Carmichael moved to enforce that parenting time order in September 2017, alleging that Mother had interfered in Father's parenting time by keeping C.E. from him. Around that same time, Shively asked Respondent to take over Mother's representation. Shively's trust in and communication with Carmichael had become "strained," she explained, and she hoped that Respondent, armed with a fresh perspective, would facilitate constructive cooperation with Carmichael. Respondent accepted, and she filed a substitution of counsel on September 28, 2017.12 Though Respondent had entered her appearance, she was not able to attend the hearing on Father's motion to enforce parenting time, which was scheduled for November 3, 2017. Shively attended in her stead. The court entered an oral ruling that day but issued a written order on November 21, 2017, adopting Carmichael's proposed order. Among other findings, the court concluded that C.E. had run away and that Mother had interfered with Father's parenting time.13 The court ordered Mother to pay Father's costs and attorney's fees within sixty days, but it did not set a sum certain for those fees or costs.14 On December 1, 2017, Respondent filed a "Request for Review of Magistrate's Decision" with the district court, which construed Respondent's filing as a request for an extension of time to file a petition for review.15 The district court granted Respondent "an extension of 14 days from the date of [its] order"—which was dated December 7, 2017—to file her petition for review.16 Respondent did not file a petition for review within those fourteen days, however. Instead, on December 27, she filed a "Request for Clarification of Extension of Time to File Request for Review." In that submission, she claimed that she had initially intended to request an extension of thirty days, in addition to the twenty-one days for appeal—totaling fifty-one days in all—which she needed in order to obtain the transcript and prepare a response.17 Yet she did not order the transcript at that time. Further, she asked the district court to clarify its order of December 7, contending that it did not "indicate what date the request for review [was] due."18 Also on December 27, Respondent filed a "Motion to Restrict and/or Modify Parenting Time Under C.R.S. § 14-10-129." On its face, the motion was unclear whether it sought to restrict Father's parenting time or merely to modify Father's parenting time. The motion alleged that C.E. had run away from Father on at least seven occasions since July 2017 and had been homeless at times. It expressed Mother's belief that if C.E. "is forced to return to his father's home for parenting time, he will suffer imminent emotional and physical harm that will place him in danger," as C.E. would likely then run away from Father and thus "could be in imminent physical danger from the cold, and from any miscreants who might harm a young boy who is homeless including human trafficking, and drug dealers."19 The motion also stated that Mother feared that Father might physically abuse or lock up C.E.20 Relying on C.R.S. § 14-10-129(4), the district court ordered a hearing on the motion within fourteen days.21 At the disciplinary hearing, Respondent explained her rationale for moving to restrict parenting time or, in the alternative, to modify parenting time. She recounted that despite earlier court findings, she and Mother believed that Father had assaulted C.E. in summer 2017. "I tend to believe victims," she declared. According to Mother, she said, C.E. had been "on the run" and "living under a bridge in Boulder" from summer 2017 until Christmas 2017, when he had appeared on Mother's doorstep. Because Mother realized that she would be in violation of the standing parenting time order if she allowed C.E. to stay at her home, she asked Respondent to take some action to protect C.E.’s safety. Respondent decided to allege these facts in the motion and leave it to the court to determine whether the facts would justify a motion to restrict or, alternatively, a motion to modify.
On January 5, 2018, the parties filed a "Joint Verified and Forthwith Motion to Continue the Date of the Hearing."22 The motion made clear that Carmichael was not available to attend the hearing set for January 10, 2018.23 That filing also disclaimed the notion that Respondent's motion of December 27, 2017, had been filed under C.R.S. § 14-10-129(4), stating, "[Respondent] is an experienced lawyer and if she intended her Motion to be treated as a C.R.S. § 14-10-129(4) [motion to restrict], she would have captioned the pleading as such."24 Both parties also waived their rights to a hearing within fourteen days.
The court denied the joint motion three days later. Noting that although Respondent did not explicitly file the motion to restrict under C.R.S. § 14-10-129(4), the court observed that the joint motion to continue suggested "that [Mother] is seeking to modify the current parenting time order and is attempting to utilize the statutory language regarding restriction to expedite such motion."25 Nonetheless, the court concluded that the motion to restrict sufficiently alleged that C.E. was in imminent physical or emotional danger due to parenting time such that a hearing had to go forward within the statutory timeframe.
That evening, Respondent and Carmichael exchanged emails. Respondent remarked that in order to continue the hearing they would need to agree to suspend parenting time; Carmichael replied that she would see if Father "would allow [C.E.] to stay with [Mother] until we can get a hearing date. ... At this moment I have no authority, but will check with [Father] and let you know."26 Carmichael later emailed Respondent that Father "will be willing to agree [C.E.] can stay where he is with the understanding that we will get a new hearing date as quickly as possible. The agreement would need to say that this does not create a presumption regarding where [C.E.] will be."27 Carmichael then offered to help draft the motion. Respondent responded quickly, noting that Mother would stipulate that C.E. could stay where he is, "and then we get this scheduled as soon as possible. We would agree that this agreement doesn't create any kind of presumption."28 Early the next morning, on January 9, 2018, Respondent filed an "Amended Motion to Modify Parenting Time and Request to Withdraw Motion to Restrict."29 That motion asked the court to consider her previous motion under C.R.S. § 14-10-129(1)(a)(1) —a provision allowing parties to request modification of parenting time. She then texted Carmichael again, saying, "I relied on your representation last night that your client is allowing [C.E.] to remain at mom's house pending a hearing ... I have withdrawn the motion to restrict and asked to vacate the hearing tomorrow. Please confirm this agreement via email ..."30 Respondent also emailed a proposed stipulation.31 Carmichael quickly replied, "The motion is basically ok," but she asked Respondent to "include language" stating that Mother would cooperate in re-enrolling C.E. in school, ensure during the time before the hearing that C.E. attends school, and make C.E. available for his therapy appointments with Father.32 Respondent asked Carmichael to type up the interim proposal, have Father sign, and then send it back that day. Carmichael indicated that she had just undergone emergency surgery the day before, though she added, "I'm home on bed rest through today, but I will prepare the document and get it to you tomorrow after my trial."33 The following day, January 10, 2018, Father, Respondent, Mother, and Patricia Bentley (Mother's mother) attended the scheduled hearing. Carmichael did not attend, as she was in trial elsewhere. The court asked Respondent whether she wished to withdraw or go forward with her motion to restrict parenting time. Respondent vacillated. She told the court that the parties had reached a stipulation, but the court replied, "I don't know anything about a stipulation. I don't have it in front of me. I can't make findings as to a stipulation."34 Ultimately, Respondent chose to withdraw the motion to restrict.35 The court then pivoted to the motion to modify, questioning why that motion would not be time-barred by a statutory provision that generally prohibits the filing of a motion to modify within two years of a past such motion.36 The court concluded by clarifying for Father that the motion to restrict was vacated and that the currenting parenting time orders remained in place. The court asked Respondent whether she had any questions or clarifications. She responded, "No. I need to speak to [Father] for a second but I'm sorry, Your Honor. I'm finished." The court replied, "Sure," and Father said "Thank you."37 Father states that after the hearing he immediately left the courtroom but was "bombarded" by Respondent, who used a "somewhat threatening" voice to tell him to get back into the courtroom to sign their stipulated agreement. Though he did not feel physically threatened by Respondent, he said, he did feel intimidated by what he perceived to be a "legal threat." Father testified that he returned to the courtroom and asked the judge whether he was obligated to sign an agreement, but the judge assured him the matter was over. Father said he left the courthouse without speaking further with Respondent.
At the disciplinary hearing Respondent did not dispute that she and Father exchanged words after the hearing on January 10, 2018, but she claimed that he approached her. According to Respondent, after she announced on record, "I need to speak to [Father] for a second," the judge responded, "sure." She interpreted that one word as granting her permission to speak with Father, notwithstanding that Father's counsel was not present.38 Despite this understanding, Respondent said, it was Father who was waiting in the courtroom vestibule for her and Mother. Respondent testified that Father brusquely demanded that C.E. return to Father's house by that afternoon, and that in response she told Mother that they needed to reconvene the hearing to tell the judge about the agreement. When they returned to the courtroom, however, the court clerk was about to lock up the doors, she said.39 Had Father actually returned to the courtroom and events transpired as he described, she remarked, "there was no way the judge would not have put that on the record."
Yet a third witness, Patricia Bentley, testified that she did not see any interaction between Respondent and Father after the hearing on January 10, 2018, nor did she recall that Father returned to the courtroom or talked to the judge.
After leaving Adams County District Court, Respondent called Thornton City Attorney Michelle Kline.40 At the time, Kline was the prosecutor on a pending criminal mischief case in which C.E. was accused of damaging Father's garage door. According to Kline, during the telephone call Respondent was "frantic" and expressed a desire to obtain a protection order against Father for C.E.’s benefit. Kline explained that Thornton municipal court did not issue general civil protection orders, but Respondent argued that it could and did. When Kline persisted, Respondent countered, "Fine, I'll call Boulder." Respondent, for her part, testified that she called Kline because Mother had been served with a citation to appear in C.E.’s municipal case, and she wanted to understand what had happened in that matter. She reported also inquiring about whether a protection order had entered in that case against C.E. for Father's protection; if such a protection order had been issued, Respondent explained, C.E. would have been prohibited from returning to Father's home.
When the call ended, Kline researched Respondent, as she found Respondent's behavior odd. Kline also looked into whether Father was involved in an ongoing domestic relations case. Kline testified that when she discovered the open domestic relations case in Adams County, in which a hearing had been held "less than an hour before" Respondent's call, she worried that a protection order may have entered in that case, which could affect the Thornton municipal court proceeding. She called Respondent back to question her about the domestic case. During that conversation, Kline recalled, Respondent repeated that she planned to seek a protection order in Boulder.
That afternoon, Respondent helped Mother and C.E. file in Boulder County Court a verified motion for a civil protection order against Father, which C.E. signed.41 The goal, said Respondent, "was to protect C.E." She and Mother worried that if C.E. were sent back to Father he would run away again, yet Mother also knew that C.E. was not allowed to stay with her. Respondent reasoned that if a protection order entered either in Thornton municipal court or in Boulder County Court then C.E. would not be forced to return to his Father's house.42 The Boulder court declined jurisdiction that afternoon, given the pending Adams County domestic relations case.43 Having met with no success in Boulder, Respondent then attempted to enforce the agreement with Carmichael. In less than one hour on the evening of January 10, 2018, Respondent sent Carmichael five separate but similar emails suggesting that Carmichael had misrepresented Father's position in their communications of January 8 and 9, 2018, and thus had violated various Rules of Professional Conduct.44 Early the next morning, Respondent resumed her email campaign, this time threatening to file a grievance against Carmichael if she did not consent to the agreement. In one email, titled "If I don't have your agreement by close of business today I am filing a grievance with the bar," Respondent wrote, in part, "The email I sent to you told you that I was relying on your representation and your email confirmed you would get me the agreement after your trial. ... If I don't get the agreement, I will file a complaint with the bar alleging violations of Rule 4.1 and 8.4."45 Carmichael replied that evening, "It is a bad idea to threaten the opposing party."46 She added, "You know [Father] is represented and you should not have talked him at all." Respondent replied,
the only thing I asked is it [sic] he had talked to you and knew you weren't coming. He confirmed that he had talked with you about the agreement. I didn't say anything else to him except after the hearing when he said "have [C.E.] back at my house" directly to me. I asked if he was going to honor the agreement that you had made on his behalf. When he said he wouldn't I went back into the court room. However, there is no threat to report this to the bar. It is a guarantee. It is my belief given your emails that you purposefully misrepresented your position and your client's position to me in an effort to prevent me from going forward with the hearing so that your client could win and we would end up with no way to bring this matter to the court's attention. That in my opinion is a violation of 4.1 and 8.4 and I will be reporting it today.47 The following day, January 12, 2018, Respondent again emailed, "Are you going to agree to the proposal you promised me you would send on behalf of your client, or should I go forward with the complaint to the bar and to the court regarding your actions."48 In response, Carmichael insisted that she did not have authority to enter into an agreement without Father's approval.49 Respondent retorted,
no you did not ever say you didn't have authority. In fact you specifically said ‘[C]hris will’ and you said that you would have him sign the motion when you returned from trial on Wed. ... So do you want me to report this to the bar and they can look at this, or do you want to honor your promise to me. I was going to make the report this morning, but was too busy to do it, so I'll give you this weekend to think about it, but if you[r] client takes action to find the child now he's on the run and enforce the June parenting order, I will report this to the bar.50 Carmichael parried, "I rejected the proposal you sent and suggested some other alternatives; however, based on what my client told me about your demeanor in and out of the courtroom, I think we will need to comply with the court order and go to mediation."51 Respondent answered, "You specifically stated you would return the stipulation after the trial."52 On January 14, Respondent pressed again: "I can send in the emails to the court and point out my reasonable reliance on your representations. I don't know what the judge will do, but I am also going to report your conduct to the Attorney Regulation Coun[sel]."53 Carmichael emailed once more, saying, "Please do not threaten me again," and Respondent replied, "It is not a threat. I will file our grievance on Tuesday."54 At the disciplinary hearing, Respondent reflected on these email exchanges. She acknowledged that threatening to grieve Carmichael did not meet required standards of professionalism, and she explained that her intent in emailing Carmichael was to reduce the conflict between counsel. In retrospect, Respondent said, she wishes she had not given Carmichael an "opportunity to cure" and instead had simply notified Carmichael that she planned to file a grievance.
On January 18, 2018, for the first time, Respondent filed with the district court a petition for review of the magistrate's order of November 21, 2017.55 In that filing, Respondent stated that her failure to order a transcript of the hearing was due to a miscommunication she had with Shively, and she alleged that the district court order granting her an extension until only December 22, 2017, to file the petition for review was an abuse of discretion. She also contended that the magistrate's order was not a final appealable order because it did not decide the amount due for attorney's fees. Not until the following day, January 19, did the Adams County court finally receive Respondent's request for a transcript of the hearing held back on November 3, 2017.56 On January 21, 2018, Respondent filed with the Colorado Court of Appeals a notice of appeal of the district court's orders regarding her requests for additional time to request review of the magistrate's order.57 She raised several of the same issues on appeal as she did in the request for review before the Adams County District Court. The court of appeals ultimately determined that Respondent had failed to timely file a petition for review of the magistrate's order.58 A dispositional conference was set in C.E.’s municipal court case for January 30, 2018. Father appeared. Mother and C.E. also attended, along with Respondent, who attempted to enter an appearance on C.E.’s behalf.59 Kline objected to the "obvious conflict" attendant in a dual representation of C.E. in the municipal case and of Mother in the domestic relations case; Kline worried that Respondent's representation of C.E. might be compromised by her advocacy for Mother and against Father in the domestic case.60 Kline also expressed concern that Mother was not permitted to retain counsel on C.E.’s behalf, as only Father had decision-making authority for C.E. Respondent maintained that she could represent C.E. but then attempted to argue about developments in the domestic relations case.61 Ultimately, the municipal court judge declined to allow Respondent to enter her appearance for C.E. and instead appointed a public defender to represent C.E.62 A few days later, Respondent submitted a "Motion to Enforce Stipulation" with the Adams County District Court. Citing the UCC, Respondent argued that under contract law she and Carmichael had a meeting of the minds and thus the settlement they reached via email was enforceable.63 The district court later denied the motion.
Claim I – Colo. RPC 1.1 The People allege that in four discrete ways Respondent provided incompetent representation in the Carmichael matter. Respondent contends that her conduct was competent in all regards. Colo. RPC 1.1 mandates that lawyers provide competent representation to their clients by using the requisite legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation. Comment 5 to the rule states that competent handling of a matter involves the "use of methods and procedures meeting the standards of competent practitioners."
The People first allege that Respondent acted incompetently when, on December 27, 2017, she filed a motion to restrict parenting time employing the language of C.R.S. § 14-10-129(4) yet stating that the motion need not be heard within fourteen days. The People also claim that Respondent acted incompetently by attempting to convert her motion to restrict into a motion to modify parenting time, even though such a motion was time-barred by the two-year restriction on subsequent motions to modify under C.R.S. § 14-10-129(1.5). We cannot find these claims proved by clear and convincing evidence. Charlene Hunter, the People's expert witness in family law matters, testified credibly that in her experience some judges will extend the fourteen-day timeframe for the hearing set forth in C.R.S. § 14-10-129(4) if the party whose time will be restricted agrees to the extension.64 Here, both parties agreed to such an extension in their joint motion of January 5, 2018. We thus cannot conclude that Respondent's conduct in filing a motion to restrict yet asking for a hearing outside of the statutory fourteen-day window fell outside the scope of "the methods and procedures meeting the standards of competent practitioners."65 Nor can we find by clear and convincing evidence that Respondent acted incompetently by attempting to convert her motion from one to restrict parenting time into one to modify parenting time. Hunter testified that a reasonably competent domestic relations lawyer would know of the two-year rule and, in the underlying matter, would understand that the rule was in place as of the June 2017 parenting time order. But Hunter also acknowledged that a reasonably competent lawyer would look out for the best interests of a child and, if a child is living on the street, a reasonably competent lawyer would strive to ensure the child's safety. Given Hunter's opinions, we find that although captioning such a motion in the alternative might not be considered the best practice, Respondent did not clearly and convincingly act with incompetence in this instance by doing so. We received no testimony to suggest that Respondent was either unaware of the rule or the contours of its application in this matter. Instead, we heard testimony that Respondent believed C.E. was in danger because he had been on the run for months, and that she brought the motion in the alternative in the hopes that the court would act to ensure C.E.’s safety by selecting the appropriate procedural vehicle based on facts she alleged. Our conclusion on this matter is also informed by the court's acceptance of the motion without levying sanctions, the court's comment on January 10, 2018, that earlier motions to restrict in the case had been converted to motions to modify, and the lack of clear and convincing evidence that no exception to the two-year bar in C.R.S. § 14-10-129(1.5) applied in the case. The People next allege that Respondent's attempt to enter her appearance on C.E.’s behalf in Thornton municipal court evidenced incompetence, as she failed to understand that representing C.E. created a potential conflict, "given the significant likelihood that [C.E.] would reveal information to Respondent that may be damaging for Mother."66 Respondent argues that no such conflict, either direct or indirect, existed. Here, too, we cannot find clear and convincing evidence of incompetence. Indeed, we did not hear any testimony or receive any evidence to support the People's theory that a substantial risk existed that Mother's interests would be jeopardized by the representation. Rather, the sole testimony about conflict that was adduced—Kline's—emphasized the possibility that parenting issues could influence the quality of representation that Respondent provided C.E., not Mother. Further, Kline's testimony did not touch on the question of incompetence. While a factfinder could infer that Respondent was incompetent by failing to identify a potential conflict, an equally plausible interpretation of the facts presented is that Respondent understood the conflict issue but assessed the likelihood of risk differently. The People have not proved this claim by clear and convincing evidence. The People's third basis for a violation of Colo. RPC 1.1 avers that Respondent exhibited incompetence by bringing a "Motion to Enforce" the stipulation she discussed with Carmichael, and by arguing that the UCC applied to negotiations between counsel as to parenting time. Again, we cannot find that Respondent acted incompetently. Hunter testified that if a child is on the street, the overriding objective is to "contact opposing counsel to cooperate together," to collectively determine which interventions might bring the child indoors so as "to get the child safe." We do not see that Respondent was incompetent by attempting to enforce what she had at least some basis to believe was a stipulation between counsel, particularly when she considered the consequences of not reaching such an agreement to be so grave. Nor do we fault Respondent for citing in the motion the UCC's definition of a contract. She cast around for legal authority supportive of her stance; though this effort was unartful, we do not find that it rose to the level of incompetence. Last, the People allege that Respondent exhibited incompetence by failing to file a timely petition for review of the magistrate's order issued November 21, 2017, and by failing to promptly order a transcript for the appeal. We cannot find that Respondent acted incompetently by failing to promptly order a transcript; a paucity of evidence was presented about this issue. Further, given the cost of transcription, Respondent's failure alone to order a transcript does not, in our view, constitute incompetence. We do find, however, that she acted incompetently by failing to file a timely petition for review of the order dated November 21, 2017. Respondent concedes that she did not timely file the petition.67 While her appellate filings evince her continued confusion about the finality—and thus the deadline to petition for review—of the order, the district court's order of December 7, 2017, should have left no doubt about her deadline: Respondent was to file the petition no later than fourteen days after the date of that order. She did not. Instead, she waited until December 27, 2017, to seek clarification of the district court's order. We find that a reasonably competent lawyer would not have allowed the period for petition to lapse, wait an additional five days, and then seek clarification of the order establishing the deadline, which was manifestly straightforward to begin with. The People have thus proved that Respondent violated Colo. RPC 1.1 by failing to timely seek review of the magistrate's order.68 Claim II – Colo. RPC 3.1 The People's second claim alleges a violation of Colo. RPC 3.1, which precludes a lawyer from bringing or defending a proceeding, or asserting or controverting an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification, or reversal of existing law. An objective standard is used to determine whether a lawyer's claim is frivolous.69 The People argue that Respondent violated this rule by filing the motion to restrict parenting time, which they characterize as frivolous and groundless "because Respondent filed it to avoid the statutory two-year bar on filing motions to modify parenting time."70 They add that she later admitted in her request to withdraw her motion to restrict that she wished for the court to treat the motion as one to modify, even though the two-year bar applied.
For many of the same reasons set forth regarding Claim I, above, we decline to find that Respondent violated Colo. RPC 3.1. Respondent had a colorable factual basis for her motion—Hunter admitted that some evidence showed that C.E. was "out of control and living on the street," and that "credible allegations" suggested that "something was going on" between C.E. and Father—as well as a colorable legal basis for the motion, evidenced by the district court's order of January 8, 2018, denying the parties’ joint motion to continue the hearing, which found "six instances in which [Respondent] claims parenting time with the opposing party places the minor child [C.E.] in imminent physical or emotional harm."71 Moreover, there is not sufficient evidence to conclude that Respondent filed the motion to avoid the two-year bar. Again, some evidence supports that assertion, but other evidence—notably, Respondent's credible testimony on this point—suggests that she brought the motion in good faith and withdrew it only in reliance on Carmichael's representations that she would prepare a motion memorializing their agreement that C.E. could remain with Mother temporarily. Clear and convincing evidence does not support this claim.
Claim III – Colo. RPC 4.2 The People's third claim is premised on Colo. RPC 4.2, which provides that when representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter. Comment 2 to the rule states that the rule applies to any such communication about the legal matter to which the communication relates. Comment 3 provides that the rule applies even if the represented person initiates the communication, and it requires the lawyer to immediately terminate any non-permissible communication. According to the People, Respondent violated this rule by engaging in a conversation with Father outside of the courtroom on January 10, 2018, after the hearing on the motion to restrict. Respondent denies that she initiated the conversation and denies that the discussion was substantive. She concurrently maintains that the judge authorized her to speak with Father.
We do not doubt that a brief conversation between Respondent and Father took place after the hearing concluded on January 10, 2018. The variance in accounts about the encounter, however, leave us unable to determine by clear and convincing evidence that Respondent violated Colo. RPC 4.2. Certainly, whether Father initiated the conversation, as Respondent and Mother claim, is immaterial to our analysis. And we reject Respondent's assertion that the judge permitted her to speak to Father. But a more central question is whether Respondent attempted to discuss with Father the agreement she believed she had reached with Carmichael, or whether she merely hastened to return both parties to the courtroom. On this question the evidence is in relative equipoise, and no account is so overwhelmingly credible or incredible that we can find that the People have met their burden on this claim.
Claim IV – Colo. RPC 4.5(a) Fourth, the People claim that Respondent threatened to file a disciplinary complaint against Carmichael unless she signed a proposed stipulation, thereby violating Colo. RPC 4.5(a). That rule forbids lawyers from threatening to bring criminal, administrative, or disciplinary charges to obtain an advantage in a civil matter. At the disciplinary hearing Respondent conceded that she violated this rule when she threatened to grieve Carmichael in several emails that she sent between January 11 and January 14, 2018. We agree.
Claim V – Colo. RPC 8.4(a) The People next claim that Respondent violated Colo. RPC 8.4(a), which states that it is professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another. The People claim that Respondent violated this rule in two discrete ways: first, by trying on January 10, 2018, to obtain in Thornton municipal court a restraining order preventing Father from contacting C.E., despite a hearing in Adams County District Court that morning affirming Father's custody of C.E.; and second, by assisting Mother on the same day to seek a civil protection order in Boulder County Court against Father for C.E.’s benefit. Both of these actions, the People claim, represent attempts to violate Colo. RPC 3.1 (meritorious claims and contentions) and Colo. RPC 8.4(d) (conduct prejudicial to the administration of justice). We do not find clear and convincing evidence that Respondent violated Colo. RPC 8.4(a) by calling Kline on the morning of January 10, 2018. Kline testified that Respondent reported wanting to obtain a civil protection order in Thornton municipal court. Kline explained that she could not obtain such an order. Respondent argued with Kline but soon hung up the phone, noting her intent to seek a protection order elsewhere. On these facts, we cannot find that Respondent's actions implicate Colo. RPC 3.1 : Respondent neither brought nor defended a proceeding, nor asserted or controverted an issue therein, when she spoke to Kline. Similarly, little to no evidence was presented to support a finding that Respondent attempted to prejudice the administration of justice under Colo. RPC 8.4(d). The People did not show that Respondent's call to Kline was connected to a judicial proceeding. Nor did they demonstrate that her call adversely affected litigation proceedings or a process fundamental to a court's administration of justice.72 We turn, then, to the People's contention that Respondent attempted to violate these same rules by assisting Mother to file a complaint for a civil protection order in Boulder County Court against Father for C.E.’s benefit. The sole testimony on this matter is Respondent's; according to her, she accompanied Mother and C.E. to the Boulder County Court, where Mother and C.E. filled out the paperwork seeking a civil protection order. The available documentation, which appears to have been handwritten by Mother and C.E., corroborates her account. We thus find no evidence to support a contention that Respondent herself attempted to violate a Rule of Professional Conduct. And though Respondent assisted Mother to seek a protection order in Boulder, we cannot find sufficient evidence that she did so in a knowing effort to bring a frivolous claim or to prejudice the administration of justice. The People have failed to convince us that Respondent's actions should be considered misconduct violative of Colo. RPC 8.4(a).
Claim VI – Colo. RPC 8.4(d) The People's final claim in the Carmichael matter alleges that Respondent violated Colo. RPC 8.4(d) when she improperly filed a motion to restrict, causing the court to set and hold an unnecessary hearing within fourteen days and causing Father to incur unnecessary attorney's fees.
We do not find that Respondent violated Colo. RPC 8.4(d). We have already concluded that under the particular circumstances presented here, Respondent did not act incompetently by filing the motion to restrict, which we also declined to deem frivolous. Under the same rationale we conclude that the motion was not improper and, thus, that Respondent did not prejudice the administration of justice by filing it.
The Porter Matter (Case Number 19PDJ056)
In October 2015, Kelly S. Bynum sued Salim's Silver Star Automobiles Service, Inc. ("Salim's) in El Paso County Court ("County Court Case").73 Bynum, who was represented by lawyer Arthur Porter, alleged that Salim's sold him a defective used engine for his 1988 Mercedes. According to the complaint, Salim's breached a warranty of fitness and merchantability, which forced Bynum to replace the faulty engine.
Ghassan ("Gus") Nehme, the sole owner of Salim's, received a fax from Porter about the lawsuit when his friend, Jason Huffer, was in the shop. Huffer, who has a real estate license and runs an advocacy organization, had inspected real estate for Nehme and brokered high-end automobile deals with him as well. Huffer offered to put Nehme in contact with Respondent; she had represented Huffer in various legal matters as far back as 2012. Nehme agreed and understood that Respondent would be serving as Salim's lawyer. Huffer also volunteered to help Nehme manage the lawsuit because he realized that Nehme was "not sophisticated" about litigation. So, from the beginning, Nehme sent Huffer all lawsuit-related documents and correspondence, assuming that Huffer would share those materials with Respondent. Because Nehme had expressed an extreme aversion to discussing the lawsuit, Respondent dealt almost exclusively with Huffer. As Nehme remembers it, he met with Respondent once or twice and perhaps had a couple of conversations with her during the entirety of the representation.
Respondent testified that Huffer represented to her that he had authority to retain her and that he was in charge of Salim's legal affairs. Respondent conceded she did not question this, nor did she investigate further. As a result, she never thought she needed to provide Nehme a fee agreement or a written statement of her fee, as she already had an existing fee agreement with Huffer. That unsigned agreement, which Respondent said was "probably" drafted in 2012, listed Huffer as client, established a rate of $50.00 per hour, and promised that Respondent would perform services described only as "legal matters."74 Respondent first filed a motion to dismiss under C.R.C.P. 12(b)(5), alleging that Bynum's complaint was barred by the statute of limitations.75 The judge quickly denied the motion, ruling, "This is an action in County Court, therefore the Rules of County Court Civil Procedure apply and motions to dismiss relying upon factual determinations are not allowed."76 A few months later, Respondent filed a motion for judgment on the pleadings; she referenced documents or evidence outside the pleadings, including various invoices.77 The judge summarily denied that motion.78 In the intervening period, Respondent filed an answer79 and scheduled mediation, regularly consulting with Huffer by email.80 During the mediation—which Huffer attended and which Nehme testified that did he not know about—Respondent asserted that European Performance Specialists, LLC ("European") was culpable in the matter because it had installed the engine for Bynum. The mediation was not successful, and Respondent and Huffer continued to plan for the hearing, including developing a factual statement to guide Respondent's preparation.81 The statement questioned whether European performed the installation properly, and it intimated that European, not Bynum, may have actually purchased the engine. Huffer recalled wondering whether European could be "brought to the table" to "economize." But Respondent did not move to join European as an indispensable party to the case.
On June 14, 2016, a trial was held in the County Court Case. Just before the trial began, Respondent and Nehme met in person for the first time. Huffer did not attend the trial. Respondent pressed for the case's dismissal based on the statute of limitations, while Porter countered that the lawsuit should survive under the doctrine of equitable tolling. Respondent also contended that Salim's sold the engine to European, not Bynum.82 Loren Southard, European's owner, testified that Bynum had in fact purchased the engine.83 The judge ruled for Bynum, finding that the contract was between Bynum and Salim's—not between European and Salim's; adopting Porter's equitable tolling defense; rejecting Porter's invitation to find Respondent's defense was frivolous and groundless; and entering judgment for Bynum for "$5,905.45 plus court costs, no attorney's fees."84 "When I left the courtroom," Nehme stated, "I was ready to pay then and there." But after the trial, Nehme said, Respondent did not explain how to satisfy the judgment. Nor did she say anything, other than to promise to contact him. He did not recall that she ever did so. Instead, Respondent discussed the matter with Huffer, advising him to appeal the judgment to district court.85 Huffer took her advice. In July 2016 Respondent filed a notice of appeal,86 and in August 2016, Huffer authorized her to order the transcript, the cost of which she said she would add to her bill.87 Huffer directed her to send to him all the invoices related to the case.88 Nehme testified that he was never aware of an appeal.
On February 23, 2017, the El Paso County District Court, sitting as an appellate tribunal, affirmed the judgment.89 Goaded on by Respondent's disparaging remarks about the justice system, Huffer decided to seek further appellate review.90 As Huffer explained, Respondent's ongoing commentary caused him to question whether corruption in the judicial system led to the outcome in the County Court Case. With Huffer's go-ahead, Respondent appealed to the Colorado Court of Appeals on March 11, 2017.91 Respondent did not seek Nehme's approval.
On Bynum's behalf, Porter moved to dismiss on the grounds that an appeal from the district court could be made only on petition for certiorari to the Colorado Supreme Court.92 The appeals court dismissed the case in May 2017, explaining that it lacked jurisdiction to consider a challenge to a district court's rulings in a case appealed from county court.93 Meanwhile, Porter began trying to collect on Bynum's judgment. He served creditor interrogatories on Nehme, who sent them to Huffer, who then passed them on to Respondent on May 3, 2019.94 Huffer also sent along some pointed commentary; he complained, "this attorney is using his law license and relationship with [the County Court judge] as a confidence game in violation of rules and laws. How will you address this? 21 days to respond began to run today. Why is there not a stay with the appeal?"95 The next day, Respondent replied, "so there isn't a stay in an appeal unless the trial court grants it which they didn't."96 She offered no assistance or advice about how to complete the interrogatories, nor did she explain the importance of either timely answering the interrogatories or timely paying the judgment. Twelve days later, Huffer emailed, "so what then, is Gus on his own here? Do you intend to respond?"97 The same day, Respondent explained to Huffer that they had exhausted their course of appeals and that "the options are to try and fight European, or just pay the judgment."98 She concluded, "I am so sorry that they were able to do this to Gus ... as you know they do whatever they feel like and don't really care how it hurts people."99 Huffer, furious, unleashed a torrent of abuse on Respondent, demanding a "plan to extricate us from this extortion and malpractice ...."100 Respondent explained that she had done everything that she could and noted that she managed to delay payment of the judgment by filing numerous appeals. She added, "the only way to possibly recover now is to sue European although we'd end up in the district court with the same problems we started out with in the home cooking stuff."101 Huffer again accused her of creating "a really big problem here," and Respondent attempted to placate him: "I understand you are upset and mad, but please don't blame me for the fault of the court system to fail to deliver justice to you and Gus."102 They spoke a few days later, and Respondent memorialized their call with a conciliatory email in which she apologized, pledging "do everything I can to make this right as I value your respect and your friendship and I understand that I am part of the system that doesn't administer justice."103 At Huffer's insistence, Respondent devised two strategies to rectify the situation. First, she would delay the deadline for the creditor interrogatories. Second, she would sue European to recoup the judgment amount assessed against Salim's. According to Huffer, Respondent advised him that European should "really take over responsibility of paying," which she would make happen by recovering the judgment and attorney's fees in a new suit against European.
On May 31, 2017—about a week after answers to the creditor interrogatories were due—she requested an additional sixty days to respond to them, falsely claiming that she did not know that the interrogatories had been served until May 19, 2017, and that she had been unable to contact her client until May 29.104 On June 1, 2017, she alerted Huffer that the court granted the sixty-day extension, but she did not counsel him or Nehme at that time to begin work on the interrogatory responses.105 At the same time, she set to work drafting a complaint against European. She checked in occasionally with Huffer.106 During that time she acknowledged that she was not working in her area of expertise, but she explained that she researched the matter and consulted with other practitioners to "think of every possible claim that could be raised against European."107 She asked Huffer to review the draft complaint "with Gus" to ensure all of the important facts of the case were covered.108 Respondent testified that the next day she, Nehme, and Huffer all had a discussion about the new complaint, and Nehme "gave the thumbs up." Nehme, on the other hand, said he never knew about the complaint, and both Nehme and Huffer disclaimed a joint discussion with Respondent about the lawsuit. We find Respondent's testimony on this point incredible, as the weight of evidence clearly points to an absence of contact between Respondent and Nehme throughout the course of Respondent's representation.
On July 17, 2017, Respondent filed the complaint in El Paso County District Court ("District Court Case").109 She asserted nine claims, including breach of contract, breach of fiduciary duty, civil conspiracy, general negligence, negligent entrustment, negligent hiring, promissory estoppel, negligence, and negligence during installation. Respondent also requested damages of $50,000.00, which, she confided to Huffer, she added "just because [she] thought it might freak [European] out a bit more."110 Huffer recalled thinking that this was an "aggressive, intimidating move" that threatened to protract the situation.
European retained Porter as its lawyer in the District Court Case. On August 1, 2017, Porter wrote to Respondent, opining that the new lawsuit was frivolous, groundless, and vexatious, and that Salim's was collaterally estopped from making any claim contrary to the established facts.111 Respondent alerted Huffer to Porter's involvement and vowed that she had "no intention of consenting to any of their bullshit."112 Huffer was outraged that Porter was representing European, insisting it represented a conflict of interest. He demanded that Respondent "stop this bullshit in its tracks. File a flurry of motions and stall the interrogatories."113 The two then exchanged emails about tactics, concluding with Huffer's instructions to attempt to stay activity in the County Court Case until the District Court Case was resolved and to serve discovery in the District Court Case as soon as possible.114 Respondent quickly filed a request to stay Salim's obligations to answer the creditor interrogatories in the County Court Case, arguing that Porter, as counsel to European and Bynum in the two suits, would share Salim's confidential business information with European.115 Porter, who viewed this bid as another "attempt to try and avoid the ramifications" of the County Court Case judgment, objected the same day.116 Almost immediately the judge denied the stay request.117 On August 8, 2017—more than a week beyond her calculated deadline to answer the interrogatories—Respondent counseled Huffer that the best way to avoid answering was to pay the judgment in the County Court Case.118 Huffer asked whether she was advising that Salim's pay the judgment, what the judgment amount was, how to pay, and whether that would give them leverage in the District Court Case. Respondent noted the judgment amount and informed Huffer that payment would end the County Court Case. But she did not counsel him to pay or provide guidance about how to do so.119 Salim's did not pay the judgment at that point, and on August 25, 2017, Porter moved in the County Court Case for a contempt citation against Salim's, seeking both remedial and punitive sanctions for failure to respond to the interrogatories.120 Porter viewed the new District Court case as improper, disturbing, and filed with the purpose of causing European "worry or concern." So, on September 1, 2017, Porter moved on European's behalf to dismiss the case. He criticized Respondent's inclusion of a specified dollar amount in damages in contravention of C.R.C.P. 8(a)(3) and her disregard of the County Court Case findings that a contract existed between Bynum and Salim's. Porter also detailed the legal failings of each of the complaint's nine claims, and he requested attorney's fees and costs under C.R.C.P. 11(a) and C.R.S. § 13-17-102 for having to defend against "this untruthful, frivolous, groundless, and vexatious pleading."121 Respondent forwarded the motion to dismiss to Huffer, exclaiming that it "obviously cost [European] a pretty penny." Huffer responded, "I cannot be sure this has cost [European] anything. I am sure that this is costing us a pretty penny."122 He also expressed concern that Respondent had not joined European as a party in the County Court Case.123 In mid-September 2017 Respondent updated Huffer about her work on the response to the motion to dismiss, saying, "So Porter has hit back hard, asking for me to pay their attorney's fees if the Petition gets dismissed. I am fighting it hard, but am concerned that hometown cooking in El Paso is going to bite us."124 At the disciplinary hearing, Huffer said he interpreted Respondent's "home cooking" comments to mean that she was being "hometowned" because Porter lived in the area and had a rapport with local judges, yet she did not. Respondent testified that she made the comments to "pacify" Huffer.
On October 23, 2017, Judge David Gilbert granted Porter's motion to dismiss, noting that Respondent had failed to file a response.125 Three days later, Respondent moved to reconsider, maintaining that she had inadvertently filed her response in another action, with the wrong case number and the wrong caption.126 Her motion to reconsider was accompanied by her response to Porter's motion to dismiss.127 On November 1, 2017, Judge Gilbert issued an order noting that he was "troubled by the multiple errors of counsel" and that "serious questions exist regarding the viability of the current case"; nevertheless, he accepted Respondent's response and allowed the parties to fully brief the dismissal motion.128 On November 8, 2017, Respondent moved to withdraw as Salim's counsel in the County Court Case, citing irreconcilable differences.129 Though Porter objected,130 Respondent's motion to withdraw was granted.131 Less than a week later she also moved to withdraw as Salim's lawyer in the District Court Case, again citing irreconcilable differences.132 Porter did not object to that request but asked the court to retain jurisdiction over Respondent to award sanctions.133 Respondent's withdrawal motion was eventually granted.134 Huffer testified he felt that Respondent had "purposefully misled" him, made mistakes in her recommendations, failed to explain matters, and then left Salim's "in the dark of night after causing chaos and expense unnecessarily."135 After Respondent withdrew from the County Court Case, Porter corresponded directly with Nehme about the case. Porter understood from those communications that Nehme did not want to litigate against European, and that he was willing to pay the County Court Case judgment.136 On November 27, 2017, Nehme paid the judgment in full, including all accrued interest.137 Porter then pressed for—but was denied—an attorney's fee award against Respondent in the County Court Case, which concluded thereafter.138 In November 2017, Judge Gilbert denied Porter's motion to dismiss in the District Court Case. Ruling that the complaint's claims "ar[o]se from the judgment issued against [Salim's] in the [County Court case]," the judge concluded that the claims were not barred by the statute of limitations, claim preclusion, or issue preclusion.139 He warned, however, "that additional discovery may give rise to potential issues of summary judgment at a later time."140 At the end of January 2018, Judge Gilbert ordered the parties to file a written status report reflecting the posture of the District Court Case within fourteen days.141 In response, Porter reported that Nehme "did not wish to be engaged in litigation with [European], that it was not his desire to be involved in another lawsuit, and that he had no intention of prosecuting this case once he separated from his attorney."142 Porter asked the court to assess attorney's fees against Respondent.143 Salim's filed a status report on February 26, 2018.144 Signed by Nehme pro se, the filing asked the court to dismiss the District Court Case without prejudice "so that [Salim's] may retain an attorney and properly litigate this action."145 On March 1, 2018, Judge Gilbert dismissed the District Court Case with prejudice.146 On March 15, 2018, Porter moved for attorney's fees against Respondent in the District Court Case under both C.R.C.P. 11 and C.R.S. § 13-17-102.147 In her response, Respondent said that she relied on Huffer's authorization for her actions, after Huffer represented "that he was a principal in the business [and] had the power to direct this litigation."148 After the complaint was filed, Respondent recounted, "Huffer became abusive and conversations were repeatedly peppered with profanity and shouting such that [she] no longer believed that she could work with [him]."149 Porter's reply telegraphed shock. Noting that in his thirty-five years of practice he had "never seen a circumstance quite such as this," Porter contended that Respondent had proceeded without Nehme's authority and at the direction of a third party who was not authorized to direct the litigation.150 Porter attached to his reply an affidavit signed by Nehme attesting that he was the principal operator of Salim's and that Huffer was never a principal in the business or a client in the District Court case.151 Respondent filed a surreply titled "Memorandum in Response to Motion to Assess Attorney's Fees," in which she stated that she emailed a draft of the District Court Case complaint to Huffer, who approved all of her actions.152 A hearing before Judge Gilbert took place in the matter on June 20, 2018. During the hearing, Respondent defended her decision to bring the case. She also answered questions about her understanding of Huffer and Nehme's relationship, and whether she fulfilled her client-centered professional duties:
THE COURT: So you had a fee agreement.
RESPONDENT: Yes. I had a fee agreement.
THE COURT: And who signed this agreement on behalf of the company?
RESPONDENT: Mr. Huffer.
THE COURT: And did he sign it as an officer or director of the company, or just by signing his name?
RESPONDENT: He did not. He signed his name and then indicated to me - I had been representing him on other matters.153 On July 12, 2018, Judge Gilbert issued an order of judgment, finding that the complaint was frivolous and groundless. He ruled that Respondent "elected to move forward on this case based upon the flawed logic of a Mr. Huffer who ... may not have had the authority to speak for [Salim's], but even so, did not present sufficient justification to counsel to conclude that [European] had any factual or legal responsibility ..."154 The order also rebuked Respondent, "The mere fact that a client representative opines that a party has liability for monetary damages assessed against them does not relieve an attorney from making some basic independent investigation of whether a prima facie case exists against that party."155 The court found that Respondent's failure to reasonably assess the situation cost European unnecessary fees, time, and inconvenience. It thus entered judgment against Respondent personally in the amount of $10,500.00.
At the disciplinary hearing Judge Gilbert testified that even though the District Court Case did not progress much beyond the motion to dismiss phase, it required significant judicial resources. The case was labor intensive, he said, because the estoppel and preclusion arguments in the motion to dismiss required him to review the County Court Case, which itself was a "complicated little matter." He and his staff spent at least forty hours on this case, though it may "easily" have stretched into the "eighty-to-one-hundred-hour range."
Respondent appealed the award of attorney's fees against her.156 On October 31, 2019, the Colorado Court of Appeals issued a unanimous opinion affirming almost all of Judge Gilbert's findings, save for one small portion of the fee award. In particular, the appellate court ruled that Respondent "did not satisfy her independent duty under C.R.C.P. 11 to investigate the facts and law,"157 rendering the complaint frivolous and groundless. The court concluded that Respondent
asserted a breach of contract claim despite the lack of a contract between European and Salim's concerning the condition of the engine, a breach of fiduciary duty claim in the absence of a fiduciary relationship, negligence claims even though European did not owe Salim's a duty of care, a civil conspiracy claim without an agreement to harm Salim's, and a promissory estoppel claim without a promise.158 In the end, Porter testified, Respondent did not promptly pay the judgment. He eventually served writs of garnishment against Respondent, and the judgment was satisfied only when two of her bank accounts were garnished.159 Claim VII – Colo. RPC 1.1 The People allege that Respondent failed to competently represent Salim's in twelve different ways. In the interests of efficiency, we group similar allegations and address them together.
• The People charge that Respondent acted incompetently in the County Court Case by filing a motion to dismiss, which was prohibited by County Court rules, and by appealing to the Colorado Court of Appeals the district court's affirmation of the ruling in the County Court Case, rather than petitioning the Colorado Supreme Court for review. We agree that these procedural missteps—both of which were documented in orders issued by those respective tribunals—reflected Respondent's lack of understanding of the basic rules governing the courts in which she appeared. She thereby violated Colo. RPC 1.1.160 • The People also claim that Respondent failed to properly investigate the structure of Salim's to determine who was authorized to act and speak for the company, and that she failed to properly investigate the facts to determine whether any evidence supported the claims she lodged against European in the District Court Case. We find that Respondent's failure to investigate these matters did not meet applicable standards of competence. She had a duty to conduct "inquiry into and analysis of the factual and legal elements" of her client's problem, yet she admittedly followed Huffer's direction without conducting any independent investigation about whether he had actual authority within the company. 161 Further, we find—as both Judge Gilbert concluded and the Colorado Court of Appeals affirmed—that Respondent filed the District Court complaint without first exploring whether the claims she brought had any factual or legal bases.
• The People aver that Respondent acted incompetently when she failed to timely respond—or advise Salim's to timely respond—to the creditor interrogatories that Porter served in the County Court Case. We find that Respondent violated Colo. RPC 1.1 on this score as well. Lawyers must know and follow all applicable rules of procedure. But here, Respondent did not counsel Salim's to answer the interrogatories, as it was obligated to do. Rather, she temporized by seeking a lengthy extension based on false factual assertions and then filed a legally baseless motion to stay. When the stay was denied she offered to appeal the decision to "drag this out a bit"; later, in an email to Huffer she boasted that she had managed to delay payment of the judgment by filing numerous appeals. Even after the interrogatories were due and Porter had sought a contempt citation, Respondent never insisted that her client complete the interrogatories. In our view, Respondent's efforts to assist Salim's to evade the creditor interrogatories, rather than to address them, constitute incompetence.162 • The People next allege that Respondent exhibited incompetence by filing the District Court Case alleging a breach of contract against European, even though the judge in the County Court Case made a specific finding that a contract existed between Bynum and Salim's. On this issue Judge Gilbert observed that the County Court Case did not necessarily settle the question whether a contract existed between Salim's and European. He also concluded, however, that Respondent had not established that Salim's and European had entered into a contract.163 Informed by this evidence, we find, as above, that Respondent acted incompetently in the District Court Case by alleging a breach of contract, because she failed to investigate or to otherwise uncover any factual bases for such a claim. But we do not find that Respondent was incompetent for alleging a breach of contract simply because the judge in the County Court Case found that a contract existed between Bynum and Salim's; neither Judge Gilbert nor the Colorado Court of Appeals endorsed Porter's estoppel or preclusion arguments, so we see no clear and convincing reason to find incompetence on that basis.164 • The People then claim that Respondent violated Colo. RPC 1.1 in the County Court Case by improperly referring in a motion for judgment on the pleadings to documents that were not part of the pleadings; by failing to join European in the County Court Case, even though she knew that European had installed the engine; and by misfiling in the District Court Case her response to Porter's motion to dismiss by using the wrong case caption and the wrong case number. On all three of these issues the People's evidence faltered. The People established that Respondent filed a motion for judgment on the pleadings, but their evidence did not show clearly and convincingly how Respondent's motion ran so afoul of County Court rules or established practices that it should be deemed the product of incompetence. So too with Respondent's failure to join European. Though the People showed clear evidence that Respondent knew about European's involvement well before the trial in the County Court Case, they failed to demonstrate that her decision not to join European was incompetent. Rather, the evidence shows that joinder was permissive, not mandatory, and that Judge Gilbert ruled that Salim's cause of action against European did not arise until judgment entered against Salim's in the County Court Case. Finally, while the People proved that Respondent misfiled her response to Porter's motion to dismiss in the wrong case, they did not show that the misfiling was a result of incompetence, rather than the result of a simple mistake that any lawyer might make under time pressure. We thus cannot find that the People met their burden to prove incompetence as to these issues.
• Finally, the People assert that Respondent acted incompetently by filing a motion for attorney's fees in in the County Court Case before the judge had ruled on any party's claims or defenses; by failing to pay the required bond when filing appeals; and by failing to the pay the jury fee when she requested a jury in the District Court Case. The People presented almost no supportive evidence or testimony as to these allegations and we decline to find any rule violations based on them.
Claim VIII – Colo. RPC 1.4(a)(2) Colo. RPC 1.4(a)(2) provides that a lawyer must reasonably consult with the client about the means by which the client's objectives are to be accomplished. The People claim that Respondent violated this rule by failing to consult with Nehme about his objectives and whether those objectives could be accomplished by bringing a lawsuit against European. Instead, the People contend, Respondent communicated with Huffer, who was not authorized to make decisions for Salim's, and together they decided to file a lawsuit that Nehme did not want to pursue.
The People have proved this claim by clear and convincing evidence. Because Respondent failed to exercise basic competence by inquiring whether Huffer was authorized to make decisions for Salim's, she allowed Huffer to direct the litigation even though he was not entitled to do so. She also consented to Huffer serving as her intermediary with Nehme, never consulting with Nehme about his litigation objectives. Indeed, the overwhelming weight of evidence shows that Respondent and Huffer alone discussed the strategy of recouping from European the amount of the County Court Case judgment; communicated about the potential benefits and pitfalls of filing the District Court Case complaint; decided to move forward with the complaint as drafted; rebuffed Porter's overtures to resolve the matter without resort to litigation; and determined to fight the motion to dismiss despite Porter's warnings. Respondent's near-complete failure to communicate directly with Nehme—compounded by her failure to inquire whether Huffer was providing Nehme correct and timely information—constitutes a dereliction of her duties under Colo. RPC 1.4(a)(2).165 Claim IX – Colo. RPC 1.5(b) The People's next claim alleges a violation of Colo. RPC 1.5(b), which mandates that when a lawyer has not regularly represented a client, the lawyer must communicate to the client in writing the basis or rate of the lawyer's fees within a reasonable time after beginning the representation. The People allege that Respondent contravened this rule because she had no existing fee agreement with Salim's and never provided Salim's or Nehme any writing setting forth the basis or rate of her fee. Respondent contends that her fee agreement with Huffer satisfied her obligations under this rule.
Respondent violated Colo. RPC 1.5(b) because she did not provide Salim's or Nehme a fee agreement or any kind of writing describing her fee. This rule violation is yet another outgrowth of Respondent's failure to investigate whether Huffer could legally act on the company's behalf. Because Respondent's unsigned, undated agreement with Huffer purporting to establish an agreement for undescribed legal services did not adequately notify Salim's or Nehme of the fees Respondent would charge in the litigation against Bynum, we find that this claim has been proved.
Claim X – Colo. RPC 1.6(a) In the District Court Case, the People claim, Respondent violated Colo. RPC 1.6(a), which states that a lawyer shall not reveal information relating to the representation of a client. The People argue that Respondent violated Colo. RPC 1.6(a) by revealing information related to her representation of Salim's in the District Court Case; they say that she improperly provided specific details about her conversations with Huffer in her March 2018 response to Porter's motion to assess attorney's fees. Respondent relies on a safe harbor provision of Colo. RPC 1.6(b)(6), which provides that a lawyer may reveal such information to the extent the lawyer reasonably believes necessary to establish a defense to a civil claim against the lawyer based on conduct in which the client was involved or to respond to allegations in any proceeding concerning the lawyer's representation of the client. We begin with the question of whether Respondent's disclosures revealed information related to the representation of a client, and we find that they did. Comment 3 to Colo. RPC 1.6 states that the rule "applies not only to matters communicated in confidence by the client but also to all information relating to the representation, whatever the source."166 Courts have interpreted this broad prohibition to encompass information readily available from public sources and not confidential in nature.167 Here, Respondent wrote in her response that she relied on Huffer's authorization for all her actions in the District Court Case, that Huffer became abusive, and that his discussions with her were riddled with profanity and shouting. Although Huffer decidedly was not Respondent's client, Respondent gathered information about Huffer's behavior in the course of the representation, and that information related to the case. Further, she believed that Huffer was authorized to speak for Salim's. Thus, when she revealed information about Huffer's behavior, that information derived from and pertained to her representation of Salim's. The information therefore falls within the ambit of Colo. RPC 1.6(a).
Next, we turn to Respondent's justification: that she was permitted to reveal this information in her own defense, as Porter's attorney's fees motion alleged that she was acting without authority. We agree that Respondent was entitled to reveal certain information about her representation of Salim's in order to refute Porter's motion, which made allegations about the representation.168 But we disagree that she was permitted to reveal all of the information that she disclosed. Though she could, under the rule, respond to Porter's accusations that she acted without authorization, she was obligated to disclose only the information that was essential to rebut his allegation.169 In our view, this did not require a description of Huffer's abuse, which added nothing to her argument that she should not be personally assessed attorney's fees for bringing a frivolous complaint. As a result, we conclude that Respondent's report of Huffer's discourteous behavior was unnecessary and thus disclosed in contravention of Colo. RPC 1.6(a).
Claim XI – Colo. RPC 3.1 The People's next claim asserts that Respondent transgressed Colo. RPC 3.1 by filing a frivolous complaint against European without first determining whether any of the claims were supported or well-grounded, as C.R.C.P. 11(a) requires, and without communicating with Nehme to ensure that he approved of the filing. As already discussed, we apply an objective standard to determine whether a case is frivolous. The filing of an action is not frivolous merely because the facts have not first been fully substantiated or because the lawyer expects to develop crucial evidence through discovery; the lawyer, however, must be informed about the client's case and the applicable law, and must determine whether a good faith argument can be made in support of the client's positions before bringing suit.170 Relying on the same rationale set forth in discussing the People's Colo. RPC 1.1 claim, above, we conclude that Respondent filed a frivolous complaint in the District Court Case. We observe, as did Judge Gilbert, that Respondent struggled to advance a cogent argument in support of the complaint's nine claims, and that she could describe no true factual investigation she undertook to support any of those the claims.171 Likewise, we echo the legal analysis set forth in the Colorado Court of Appeals opinion.172 But we are also swayed by the fraught interpersonal dynamics between Respondent and Huffer in May 2017, after it became clear that the County Court judgment would not be vacated on appeal and instead was due and owing. We believe that this context provides yet more evidence to support the claim that Respondent failed to investigate the factual and legal antecedents of the District Court Case complaint. Respondent's and Huffer's communications from that time reveal an irate Huffer who blamed Respondent for real and imagined mistakes, to which he attributed the ultimate outcome of the County Court Case. Respondent, who appeared to prize her relationship with Huffer, cast around for any solution that might mollify him and salvage the situation. With no other options, she proposed a new lawsuit in which all could be made right by recovering from European the amount of the County Court Case judgment plus Salim's attorney's fees. Her proposal was grounded not in sound legal analysis or even rudimentary factual investigation; it was fueled by her desire to preserve her relationship with Huffer.173 Taking all this evidence together, we find that Respondent violated Colo. RPC 3.1 in filing an objectively frivolous complaint.174 Claim XII – Colo. RPC 3.3 Colo. RPC 3.3(a)(1) forbids lawyers from knowingly making a false statement of material fact or law to a tribunal or failing to correct a false statement of fact made to the tribunal. Under this rule, a lawyer "must not allow the tribunal to be misled by false statements of law or fact."175 The People claim that Respondent transgressed Colo. RPC 3.3(a) when, in her colloquy with Judge Gilbert at the hearing in June 2018, she misrepresented that she had a fee agreement with Huffer, who had signed on behalf of Salim's. We agree that this was, in fact, a misstatement; Respondent had no fee agreement with Salim's governing either the County Court Case or the District Court Case. But we lack persuasive evidence that Respondent knowingly made this false statement of material fact. We find credible Respondent's testimony that she believed Huffer was authorized to speak on behalf of Salim's, that she had an existing fee agreement with Huffer, and that she therefore had a valid fee agreement with Salim's. For that reason, we cannot conclude under the clear and convincing standard that Respondent knowingly made misrepresentations to Judge Gilbert. We decline to find that she violated Colo. RPC 3.3(a)(1).
Claim XIII – Colo. RPC 3.4(d) Claim XIII alleges that Respondent acted in contravention of Colo. RPC 3.4(d), which provides that in pretrial procedure a lawyer must not fail to make reasonably diligent efforts to comply with legally proper discovery requests by an opposing party. This rule contemplates that proper functioning of the adversary system depends on fair competition, which itself is safeguarded by prohibitions against obstructive tactics in discovery.176 According to the People, Respondent flouted this rule in the County Court Case by failing to advise Salim's that the company needed to timely respond to the creditor interrogatories, by failing to make a reasonably diligent effort to have Salim's answer the interrogatories, and by delaying answering the interrogatories through requests for extensions of time. We agree with the People. As we remarked above, once the district court affirmed the county court's findings, Respondent's efforts in the County Court Case were primarily directed toward assisting Salim's to avoid, rather than comply with, its duty to answer the creditor interrogatories. Indeed, only after Respondent withdrew from the County Court Case did Salim's take action to address the outstanding judgment in that matter. We conclude that Respondent violated Colo. RPC 3.4(d).
Claim XIV – Colo. RPC 8.4(d) Last, the People allege that Respondent prejudiced the administration of justice in the District Court Case, thereby violating Colo. RPC 8.4(d). The People argue that as a result of Respondent's failure to comply with C.R.C.P. 11 by filing a frivolous and groundless lawsuit against European, she caused the court and the parties to expend unnecessary time, resources, and money before the case was ultimately dismissed. We agree with the People that Respondent violated this rule. Her shambolic prosecution of the District Court Case led Judge Gilbert and his staff to spend unnecessary time and resources on an unwanted, meritless case.
The Shih Matter (Case Number 19PDJ056)
Nicole Washington and A.C. have a child, R.C. Washington and A.C. were never married. In August 2016, A.C. filed a petition for allocation of parental responsibilities ("APR") in Denver District Court. Later, A.C. and Washington reached an agreement on parenting time, and the case was dismissed without prejudice in September 2016.177 Washington then brought a child support action in Arapahoe County; an order eventually entered in that matter directing A.C. to make child support payments to Washington.
On December 28, 2017, Respondent filed on Washington's behalf a petition for APR in Arapahoe County.178 The Arapahoe court scheduled an initial status conference ("ISC") for February 7, 2018, and directed Washington to file a return of service before the ISC took place.179 Without conferring with A.C., Respondent rescheduled the ISC for February 21, 2018.
On February 5, 2018, A.C. filed a motion to dismiss through his counsel, Theodore Shih.180 The motion alleged that because A.C.’s father—not A.C.—had been served, the court should dismiss the action for insufficiency of process, insufficiency of service of process, and lack of jurisdiction. Shih emailed Respondent to alert her that the court planned to address the motion to dismiss at the ISC but that he was not available on February 21, 2018. He proposed other dates and volunteered to prepare the notice of hearing. Respondent responded that the ISC had already been set, declaring, "You are either representing [A.C.] or not and if you are representing him tell me where he lives and we will serve him. Don't play games with me because we will file a motion for publication if you refuse to provide a reasonable address."181 Shih replied that by filing the motion to dismiss for A.C., he was A.C.’s attorney of record, adding, "I have no duty to cure your inappropriate service of process as part of my representation of [A.C.]."182 On February 8, 2018, Shih emailed Respondent again for dates for the ISC; Respondent answered, "If you are entering your appearance then you can participate if you are not then how can you get standing to do anything."183 Shih, who testified that he was at that point very frustrated, resolved to "cut and paste" certain rules in his emails to explain some legal tenets that he believed were "pretty fundamental." Citing C.R.C.P. 121 § 1-1(1), Shih wrote, "First ... By filing the Motion to Dismiss, my appearance was entered. ... Second, you misconstrue the term ‘standing.’ C.R.C.P. 12 specifically authorizes a party to contest ... insufficiency of service of process."184 He also maintained that "A.C. certainly had ‘standing’ to contest the Court's jurisdiction over him."185 Shih reiterated that the court had asked him to set an ISC and again requested dates that worked for Respondent.
She did not reply. Instead, she filed three motions that same evening. First, she filed a response to the motion to dismiss, objecting to rescheduling the ISC "for the benefit of [A.C.]’s lawyer if he is NOT representing [A.C.]. He is either entering his appearance and therefore is a party to this action, or he is NOT and therefore he is not properly a party to this action, and cannot request that the ISC be rescheduled for his benefit."186 Because Shih refused both to accept service and to provide a valid address for A.C., she requested that the court either order to Shih "to provide a valid address for his client, or dismiss [Shih's] Motion to Dismiss as lacking standing in this matter as not properly before the Court at this time."187 Respondent also contended that "In domestic relations cases, there is no such thing as a Motion to Dismiss under 12(b) for failure to serve the individual at this stage of the proceedings."188 She did not cite legal authority for any of these propositions. Second, she filed a motion for publication on the grounds that a "[s]earch has been made of the telephone and other available directories" and "various inquiries have been made of persons who may have information concerning the address and whereabouts of [A.C.]."189 The motion for publication was not verified by Washington, as C.R.C.P. 4(g) and form JDF 1301 direct.190 Third, Respondent filed a notice of hearing, setting the ISC for February 21, 2018—the very date Shih said that he was unavailable.191 Shih was forced to ask the court to reschedule the ISC.192 The court ordered Respondent to get new dates from the clerk.193 When Respondent did not take any action, the court issued an order on February 21, 2018, directing her to reset the ISC, which was to "occur within fourteen days," or the APR case would be dismissed.194 Respondent set the ISC for March 21, 2018. Both Respondent and Shih attended. During the conference, the court entered temporary orders naming Washington as primary custodial parent.195 In the wake of the ISC, Respondent filed a new motion for publication, this time verified by her client but providing scant additional detail about her efforts to serve A.C.196 On April 17, 2018, Shih moved to dismiss the APR in Arapahoe County, citing lack of service and contending that venue was properly seated in Denver.197 As Shih testified at the disciplinary hearing, he and his client had come to believe that Washington was living in Denver, not in the townhome she owned in Aurora. Shih concurrently filed an APR petition in Denver District Court, seeking sole decision making authority, primary residential custody, and child support.198 Respondent in turn moved in Arapahoe County to consolidate the two cases to decide the venue.199 In May 2018, the Denver court dismissed A.C.’s APR petition.200 Around the same time, Respondent managed to serve A.C. in the Arapahoe case.
A hearing on venue was then set before the Arapahoe court for mid-September 2018.201 In advance of the hearing, both parties spent time preparing their cases. Shih moved to compel mandatory financial disclosures and propounded limited discovery about venue. Rather than send Shih the relevant information, Respondent submitted to the court a public filing titled "Filing of Exhibits Regarding Venue," comprised of documents containing Washington's name, financial information, federal identification number, and date of birth.202 Later, Respondent filed with the court Washington's responses to A.C.’s interrogatories and requests for production with the court; those responses, too, contained some of Washington's personal information.203 Separately, Shih filed a motion for sanctions, arguing that Washington's disclosures were insufficient. Responding in late August 2018, Respondent argued—without citing any authority—that Washington need not provide any financial disclosures, as her financial information had already been provided to A.C. in a parallel child support enforcement case.204 Respondent also argued that Washington was required to produce discovery concerning venue only to the extent she deemed that discovery "germane to the issue."205 A few days before the hearing, however, Respondent moved to dismiss the entire case.206 The Arapahoe court granted her motion.
On September 27, 2018, A.C., through Shih, again petitioned for APR in Denver District Court.207 A standard form domestic relations case management order issued two days later; the fourth section of that order informed the parties that they were required to exchange proof of income and expenses with the other, file a sworn financial statement, and exchange copies of documents identified in a mandatory disclosure form.208 The order also reminded the parties that disclosures and discovery were governed by C.R.C.P. 16.2.209 Washington was served, and the Denver court held a status conference at which Respondent suggested that the case could benefit from appointment of a Child and Family Investigator ("CFI"). On February 8, 2021, Respondent filed a "Request for Appointment of CFI." Rather than using the standard form motion for CFI appointment,210 Respondent's request set forth a lengthy history of the parties’ interactions but omitted legal citations as well as a crucial element required by the form—the proposed allocation of the CFI's fees between the parties.211 A little more than a week later, Respondent submitted a second, similar, filing titled "Motion for CFI Appointment" that suffered from the same deficiencies as her first motion.
In response to A.C.’s written discovery requests for financial information and other issues concerning possible reallocation of parenting time, Respondent objected to what she termed "irrelevant financial discovery."212 In that public court filing, she copied all of her client's answers and objections to interrogatories, and she argued that Washington's financial disclosures were immaterial to determinations of parenting time.213 After receiving Respondent's filing, the Denver court informed both parties that it would no longer accept discovery dispute motions in the case.214 According to Respondent, A.C. ultimately chose to relinquish his parental rights. Washington was awarded full custody and full decision-making authority for her son. Washington testified that Respondent was "very on top of" the case, explained her options, counseled her about how to save money, and followed her directions concerning the case. According to Washington, if Respondent did not provide financial information "it was because I didn't want her to provide it."
Claim XV – Colo. RPC 1.1 The People allege that in seven respects Respondent failed to provide Washington competent representation:
• First, the People allege that Respondent failed to understand that Shih had entered his appearance in the Arapahoe case when he signed the motion to dismiss. We agree. Even after Shih explained via email that a lawyer's signature on a filing is construed as an entry of appearance under C.R.C.P 121, Respondent persisted in arguing to the court that Shih had not entered his appearance and thus violated Colo. RPC 1.1.215 • Second, the People allege that Respondent failed to understand that A.C. had standing to contest jurisdiction even if he had not been served in the Arapahoe case. Again, we agree that Respondent transgressed his rule. Respondent's debates with Shih evinced a lack of understanding of this basic legal tenet contemplated by C.R.C.P. 12(b).
• Third, the People contend that Respondent failed to comply with C.R.C.P. 4 when filing her first motion for service by publication, as the motion lacked a verified statement by Washington or another person describing her efforts to obtain personal service. Here, too, we agree that Respondent violated Colo. RPC 1.1. C.R.C.P. 4(g) is clear that a verified statement is required; to overlook such a straightforward yet crucial instruction strikes us as incompetent representation.216 • Fourth, the People maintain that Respondent acted incompetently by failing to cite legal authority in her motions. By the Hearing Board's count, Respondent did not cite authority in her February 2018 response to Shih's motion to dismiss, both motions for publication, her August 2018 response to Shih's motion for sanctions, and both motions for appointment of a CFI. Respondent could have—and should have, testified the People's expert, Hunter—used judicial forms to move for publication and for appointment of a CFI. That neither judicial form cites legal authority leads us to the conclusion that we cannot fault Respondent for likewise failing to do so in those motions. Respondent's responses to Shih's motions to dismiss and for sanctions present a closer call. Though we consider her failure to cite authority unprofessional and unwise, we cannot find that the People clearly and convincingly proved this failure constituted misconduct under these limited, fact-intensive circumstances.
• Fifth, the People claim that Respondent failed to render competent representation by refusing to produce mandatory disclosures in the Arapahoe case and the second Denver case. Instead, they say, she filed a baseless motion incorrectly arguing that financial disclosures were irrelevant. Hunter explained that an APR case necessarily entails possible reallocation of child support payments; if a child's time with each parent changes, so, too, will child support calculations change. Hunter opined that because a reasonably competent domestic relations lawyer would understand the interplay between child support and APR, such a lawyer would appreciate that finances are relevant to parenting time disputes. Hunter also stated that a competent lawyer would understand C.R.C.P. 16.2 to require mandatory financial disclosures—including, at a minimum, proof of income and expenses—as well as prompt supplements to those disclosures. Based on this testimony, we find that Respondent incorrectly understood and incompetently approached the disclosure requirements in domestic relations cases and the key role financial disclosures play in APR matters.
• Sixth, the People state that Respondent failed to act competently when she improperly filed exhibits and interrogatory answers with the Arapahoe court, even though a hearing had not yet occurred and even though the filed documents included confidential client information. Though these allegations give us pause, we find that the People did not meet their burden of proof on this sixth issue. We did not hear any pertinent testimony about the manner in which Respondent made these filings or the context in which she made them. The People's incompetence claim on this issue simply failed to crystallize. We thus cannot find clear and convincing evidence of a rule violation on this score.
• Seventh, the People argue that Respondent acted incompetently when she filed a second motion for appointment of a CFI without awaiting ruling on her first motion. While we concede that this conduct is puzzling, the People presented no proof that it constitutes incompetence under Colo. RPC 1.1.
Claim XVI – Colo. RPC 8.4(d) Finally, the Hearing Board turns to the People's claim that Respondent violated Colo. RPC 8.4(d) by prejudicing the administration of justice. She did so, they say, by (1) filing various improper notices and motions in the Arapahoe County case; (2) causing the Arapahoe court and the opposing party to expend unnecessary time and resources and then voluntarily dismissing the case; and (3) causing the Denver court and the opposing party to expend unnecessary time and resources by failing to provide mandatory disclosures and arguing that Washington's financial information was irrelevant to issues of child custody and parenting time. We address the first two contentions together. Undisputedly, the parties’ lawyers did not see eye-to-eye on the law or proper procedure, so the litigation was high-conflict and contentious. Shih blames Respondent for wasting time and resources; Respondent points the finger at Shih.217 Though we by no means find Respondent inculpable in this matter, neither can we clearly and convincingly assign complete responsibility to her for prolonging the litigation or wasting resources. Hunter, in fact, questioned some of Shih's tactical decisions as to venue. In the end, the rather byzantine procedural history of these intertwined cases was the product of the underlying history of the parties, the dysfunctional dynamics between the two lawyers, and the novel service and venue issues that surfaced along the way. Last, we turn to whether to classify Respondent's approach to financial disclosures as prejudicial to the administration of justice. Shih, certainly, believes he was grossly inconvenienced by Respondent's handling of the case. But we did not hear any evidence or receive any testimony that court officers or personnel felt likewise, save for the Denver court's admonition to both parties that they were no longer welcome to file discovery motions. We decline to find a violation of Colo. RPC 8.4(d) in the absence of more robust evidence of actual prejudice to the administration of justice.
OARC Matter (Case Number 20PDJ030)
During the discovery phase of disciplinary case number 19PDJ056 (encompassing the three matters discussed above), the People provided Respondent the report of their expert, Charlene Hunter. The report included Hunter's opinions about Respondent's lack of competence in the three underlying legal matters discussed in case number 19PDJ056. After receiving the report, Respondent spoke with lawyer Jody Brammer-Hoelter, Respondent's friend, mentor, and former practice monitor. Respondent asked Brammer-Hoelter to pen a rebuttal expert report in her disciplinary matter, and in particular to offer expert opinions about her competence.218 Brammer-Hoelter testified that around that time Respondent seemed overwhelmed and frantic.
Even though Respondent asked Brammer-Hoelter to serve as her rebuttal expert, Respondent began drafting an expert report herself. The rebuttal report was due on February 18, 2020. On that day, the two women exchanged many emails. At 1:26 p.m. Brammer-Hoelter emailed Respondent, inquiring about the form that her rebuttal report was to take and cautioning, "I can draft a response based on general concepts, but I don't think I have the time to refute Hunter's report item by item. I'm assuming you will be signing the response?"219 Respondent replied at 2:32 p.m. She sent a five-page draft report listing herself as the author and told Brammer-Hoelter, "I will keep working on it, and if you are okay with putting your name on it as an expert that would be awesome."220 At 2:56 p.m., Brammer-Hoelter affirmatively stated, "Is there any way you can get additional time? I can't sign something that I haven't had time to write."221 Respondent then sent a longer draft to Brammer-Hoelter at 5:39 p.m.; the draft did not include Brammer-Hoelter's name or otherwise indicate that Brammer-Hoelter had authored it.222 Despite Brammer-Hoelter's clear refusal to sign a report that she had not written, at 6:56 p.m. that evening Respondent typed Brammer-Hoelter's name on the top and bottom of the expert report.223 According to Brammer-Hoelter she did not write any portion of the submitted rebuttal report, nor did she direct Respondent what to write. Brammer-Hoelter also testified that she did not authorize Respondent to use her name on the report or to identify her as its author. But Respondent filed the falsified rebuttal expert report with the PDJ and sent her report to the People.
At 6:57 p.m., Respondent emailed Brammer-Hoelter a copy of the thirteen-page expert rebuttal report that she had already filed with the PDJ and submitted to the People. The subject line of the email was, "I hope this is ok. I got really worried and took a chance to file this," and the email message read, "I will provide everything that you need to support this as an expert report, but I do need your CV."224 Brammer-Hoelter testified that she was "alarmed and upset" when she saw Respondent's email.
Brammer-Hoelter, who responded that she was still working on her own report, implored Respondent, "please don't file anything in my name."225 Brammer-Hoelter again emailed around 8:00 p.m. that night, writing, "your action of filing something under my name, without giving me the chance to read and revise (which I have been doing) makes it impossible to defend you against the PDJ action. Please withdraw the filing, so that I don't have to contact PDJ to do it myself. Thanks!" Brammer-Hoelter recalled feeling "angry and devastated" by Respondent's behavior, not only because she spent a lot of time the previous weekend working on a rebuttal report but also because she felt as though Respondent had tried to take advantage of their friendship.
Early on the morning of February 19, 2020, Respondent emailed Brammer-Hoelter several times, asking to speak with her and volunteering to withdraw or strike the report if Brammer-Hoelter did not feel comfortable with it.226 She did not immediately take action to withdraw the falsified report, however, as Brammer-Hoelter had already asked her to do.
At 10:33 a.m., counsel for the People emailed Respondent to explain that, per the PDJ's scheduling order, expert reports were to be exchanged between the parties, not filed with the PDJ.227 About fifteen minutes later, counsel for the People again emailed Respondent to explain that she had failed to comply with expert disclosure rules because she had not included with the rebuttal report the expert's CV, fee agreement, and time billed.228 At 10:50 a.m., Respondent emailed the PDJ, asking the PDJ to reject the expert report because she had not understood when she filed it that reports were only to be exchanged between the parties.229 She did not withdraw the expert report at that time. An hour later, Respondent emailed the People to inform them that she was working on getting the expert's CV and other information, noting that "[t]he individual has had a family member crisis and I haven't been able to reach her today."230 Around lunchtime on February 19, 2020, counsel for the People contacted Brammer-Hoelter and learned that she had neither written, reviewed, nor authorized her name or signature to be placed on the report. At 2:32 p.m., counsel for the People emailed Respondent, telling her that counsel had spoken to Brammer-Hoelter and discovered Respondent's deception.231 At 3:42 p.m., after Respondent knew the People had learned the report was falsified, she withdrew the report in an email to the People and the PDJ.232 Claim III – Colo. RPC 3.4(b) 233 Colo. RPC 3.4(b) forbids lawyers from falsifying evidence, among other acts. The People allege that Respondent falsified her expert rebuttal report in three respects: first, that she intentionally changed the introductory language and the concluding typed signature in the report from her own name to that of her expert, Brammer-Hoelter; second, that she typed Brammer-Hoelter's signature at the bottom of the report; and third, that she added additional substantive material to the draft report that she had provided to Brammer-Hoelter without notifying Brammer-Hoelter that she had revised the draft. In her closing argument, Respondent's counsel agreed that Respondent had violated this rule.
We, too, agree that Respondent falsified evidence in this disciplinary matter, violating Colo. RPC 3.4(b). Although Respondent's rebuttal expert report states that Brammer-Hoelter prepared and submitted it, Brammer-Hoelter testified that she did not write any portion of the document, nor did she direct Respondent what to write. Brammer-Hoelter also testified that she did not authorize Respondent to use her name on the report or to identify her as its author. The relevant timeline bears out her testimony. On the afternoon of February 18, 2020, Respondent sent Brammer-Hoelter a five-page draft of the report, which listed Respondent as the author. Respondent asked Brammer-Hoelter to sign it. Though Brammer-Hoelter demurred, telling Respondent that she could not sign a report that she had not written, Respondent submitted to the PDJ and the People a thirteen-page report—which contained material that Brammer-Hoelter had never even seen—under Brammer-Hoelter's name and signature. This uncontested evidence clearly and convincingly establishes Claim III in case number 20PDJ030.
Claim IV – Colo. RPC 8.1(a) Colo. RPC 8.1(a) prohibits a lawyer from "knowingly mak[ing] a false statement of material fact" in a disciplinary matter. Entry of judgment on a claim premised on Colo. RPC 8.1(a) must include a finding that the lawyer possessed a knowing mental state.234 The People say that Respondent breached this rule when she submitted the falsified expert report in case number 19PDJ056. They assert that the falsified report was material because it addressed the essential issues in case number 19PDJ056. Further, they argue, Respondent knew when she submitted the report that Brammer-Hoelter had neither authored, revised, nor approved it, yet she intended the People to believe that the opinions it contained were those of Brammer-Hoelter. Though Respondent's hearing brief contested that she acted with a knowing mental state, Respondent's counsel stated in closing argument that Respondent admits she violated this rule.
We find the People have established that Respondent knowingly made a false statement of material fact to disciplinary authorities when she submitted her rebuttal expert report. In listing Brammer-Hoelter as the report's author, Respondent falsely represented that Brammer-Hoelter had prepared the report when in fact she had contributed nothing substantive to the document. The report thus constituted a false statement. Moreover, the report was indisputably material to Respondent's disciplinary case, as it discussed the issues and defenses central to the claims in case number 19PDJ056. Further, the sequence of Respondent's emails demonstrates that Respondent knew that Brammer-Hoelter had neither reviewed the report nor authorized Respondent to submit any version of the report under her name. Respondent acknowledged as much when she apologized to Brammer-Hoelter the day after she submitted the report, writing, "[i]f you aren't comfortable with what I wrote I'll ask to strike it."235 We conclude that the evidence presented at the hearing clearly and convincingly demonstrates that Respondent knowingly violated Colo. RPC 8.1(a).
Claim V – Colo. RPC 8.4(c) The People's last claim alleges that Respondent's conduct in submitting a false rebuttal expert report constitutes misrepresentation proscribed by Colo. RPC 8.4(c). That rule states, in pertinent part, that "[i]t is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation." Unlike misconduct under Colo. RPC 8.1(a), a showing of actual knowledge is not required to establish a violation of Colo. RPC 8.4(c).236 Rather, the lawyer must have possessed "a mental state of at least recklessness," which means that the lawyer deliberately closed her eyes to facts the lawyer has a duty to see or recklessly stated as facts things of which the lawyer is ignorant.237 The People allege Respondent misrepresented that Brammer-Hoelter prepared and expressed her opinions in the rebuttal expert report. Although Respondent's counsel admitted in closing that she had violated this rule, she argues in her hearing brief that the conduct underlying her breach of Colo. RPC 8.1(a) should not also support a claim under the "catch-all" provisions of Colo. RPC 8.4(c), and she presses the Hearing Board to disfavor such charging as unwarranted.
After considering the exhibits and testimony adduced above, we agree with the People that Respondent knowingly misrepresented, both to the People and to the PDJ, that Brammer-Hoelter authored the rebuttal expert report. Moreover, Respondent persisted in the misrepresentation by assuring the People that she was working to obtain Brammer-Hoelter's CV and other supporting materials, even though she knew Brammer-Hoelter had asked her to withdraw the report. We conclude that Respondent took each of these actions with the purpose of misleading disciplinary authorities that Brammer-Hoelter had authored the rebuttal report. Accordingly, we find that the People have established this claim by clear and convincing evidence.238 III. SANCTIONS The ABA Standards for Imposing Lawyer Sanctions ("ABA Standards ")239 and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.240 When imposing a sanction after a finding of lawyer misconduct, a hearing board must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the misconduct. These three variables yield a presumptive sanction that may be adjusted based on aggravating and mitigating factors.
ABA Standard 3.0 – Duty, Mental State, and Injury
Duty : Respondent violated several duties central to the attorney-client relationship, including duties of competence and communication, as well as the duty to preserve client confidences. Respondent also abandoned her duties as an advocate within the legal system. And she disregarded the duties she owed as a professional, including the duty to maintain her personal integrity and the duty to uphold confidence in and respect for the judicial process. Mental State : We conclude that by deviating from the standard of care that a reasonable lawyer would exercise, Respondent acted negligently when she violated Colo. RPC 1.1 in the Carmichael, Porter, and Shih matters. We likewise find that Respondent acted negligently when she violated Colo. RPC 1.4(a)(2), Colo. RPC 1.5(b), Colo. RPC 1.6(a), Colo. RPC 3.1, and Colo. RPC 8.4(d) in the Porter matter. As to Respondent's violation of Colo. RPC 4.5(a) in the Carmichael matter and her violation of Colo. RPC 3.4(d) in the Porter matter, we find that she acted knowingly. Finally, we conclude that in the OARC matter Respondent acted knowingly when she deceived disciplinary authorities by submitting a false expert report, and that she submitted the falsified rebuttal report with the intent to benefit herself. However, that intended benefit was qualified and minimal: we find that Respondent viewed the falsified submission as a placeholder that would satisfy the rebuttal report deadline but that would eventually be withdrawn or replaced with Brammer-Hoelter's true expert rebuttal report.
Injury : In the Carmichael matter, Respondent jeopardized Mother's legal position by failing to timely file the petition for review, and she drove up attorney's fees on both sides by continuing to litigate this mistake in the appellate court. Further, she injured Carmichael by threatening to file a grievance against her; those threats, which Carmichael viewed as harassing and embarrassing, caused her unnecessary stress.
In the Porter matter, Respondent harmed Bynum by obstructing efforts to collect on the County Court Case judgment for over a year and a half. As a result of Respondent's "machinations," Porter reported, Bynum's attorney's fees exceeded the amount of the judgment in that matter. Respondent caused European significant financial harm, as her frivolous and groundless District Court Case forced European to incur thousands of dollars in costs and attorney's fees. Finally, Respondent planted seeds of doubt in Huffer's mind about the integrity of the judicial process; because she did so, Huffer insisted that she pursue further remedies, which in turn tied up the legal system in needless litigation and resulted in the waste of judicial time and resources.
In the Shih matter, Respondent caused her client potential harm by making legal arguments with no legal basis and by disregarding court rules. She also harmed A.C. by submitting incompetent filings, which required him to respond and thus incur additional attorney's fees.
In the OARC matter, Respondent caused little to no actual or potential injury to the legal proceeding or to any participant. From the start, Respondent was candid with Brammer-Hoelter that she had submitted an expert rebuttal report under her name and signature. Further, the People quickly became aware of the falsification, which likely would have had little to no effect on the proceeding even if the People had never discovered Respondent's deceit. Nevertheless, Respondent's falsification seriously undermined the reputation of the legal profession and thus the integrity of the legal system. This is because "[i]f lawyers are dishonest, then there is a perception that the system, too, must be dishonest."241 ABA Standards 4.0-7.0 – Presumptive Sanction
Public censure is the presumptive sanction for several of Respondent's rule violations under the following ABA Standards :
• Violations of Colo. RPC 1.1 are governed by ABA Standard 4.53, which applies when a lawyer demonstrates that she or he fails to understand relevant legal doctrines or procedures and causes injury or potential injury to a client. • Violations of Colo. RPC 1.4(a)(2) are governed by ABA Standard 4.43, which applies when a lawyer is negligent and does not act with reasonable diligence in representing a client, causing the client injury or potential injury.
• Violations of Colo. RPC 1.5(b) are governed by ABA Standard 7.3, which applies when a lawyer negligently engages in conduct that is a violation of a professional duty and thus causes injury or potential injury to a client, the public, or the legal system.
• Violations of Colo. RPC 1.6(a) are governed by ABA Standard 4.23, which applies when a lawyer negligently reveals information relating to the representation of a client not otherwise lawfully permitted to be disclosed, when the disclosure causes injury or potential injury to a client.
• Violations of Colo. RPC 3.1 and Colo. RPC 8.4(d) are governed by ABA Standard 6.23, which applies when a lawyer negligently fails to comply with a court order or rule, thereby causing injury or potential injury to a client or other party, or interference or potential interference with a legal proceeding.
Under ABA Standard 6.22, suspension is the presumed sanction for Respondent's violations of Colo. RPC 4.5(a) in the Carmichael matter and Colo. RPC 3.4(d) in the Porter matter; that Standard applies when a lawyer knowingly violates a court order or rule, causing injury or potential injury to a client or a party, or interference of potential interference with a legal proceeding.
In the OARC matter, Respondent's violation of Colo. RPC 3.4(b) is governed by ABA Standard 6.12, which calls for suspension when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld yet takes no remedial action, thereby causing injury or potential injury to a party to the legal proceeding or an adverse or potentially adverse effect on the legal proceeding. Respondent's violations of Colo. RPC 8.1(a) and Colo. RPC 8.4(c), in contrast, are governed by ABA Standard 7.1, which provides that disbarment is generally appropriate when a lawyer knowingly violates a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.
ABA Standard 9.0 – Aggravating and Mitigating Factors Aggravating circumstances include any considerations that justify an increase in the degree of the sanction to be imposed, while mitigating factors warrant a reduction in the severity of the sanction.242 As explained below, the Hearing Board applies seven factors in aggravation, two of which carry substantial weight, and four factors in mitigation, two of which carry substantial weight.
Aggravating Factors Prior Disciplinary Offenses – 9.22(a) : In 2013, Respondent was suspended from the practice of law for six months, all stayed pending completion of a three-year period of probation, with conditions. The probation took effect on October 30, 2013, and terminated on October 30, 2016. In that case, Respondent was disciplined for several types of misconduct. First, Respondent represented a client in several legal matters but also hired the client to clean her house and to work on her political campaign. Respondent planned to offset the money she owed her client against the legal fees her client owed her, but she never specified the hourly rate the client would be credited for her work, nor did she communicate in writing the basis or rate of her legal fees in violation of Colo. RPC 1.5(b). Second, Respondent posted bond for the client and paid the client's rent and vehicle impound fees, which were not legitimate litigation expenses, contravening the conflict of interest limitations in Colo. RPC 1.8(e). Third, Respondent provided the client legal advice by filing the client's income taxes; she did so with the expectation that the client's tax refund would be applied to amounts the client owed her for posting bond. Respondent's personal interest in obtaining the tax refund created a significant risk that this interest would materially influence her tax and general legal advice, thereby violating Colo. RPC 1.7.
We accord this prior discipline great aggravating weight. While Respondent was on probation in this prior disciplinary case for failing to provide her client a fee agreement, she flouted the very same rule in the Porter matter by neglecting to provide Nehme any basis for her fee in writing. That Respondent committed the same rule violation during a period when she should have had heightened awareness of her professional duties causes us to question whether she is willing and able to conform her behavior to the Rules of Professional Conduct.
Dishonest or Selfish Motive – 9.22(b) : We find that Respondent acted selfishly by affixing Brammer-Hoelter's name and typed signature on the rebuttal expert report, even though Brammer-Hoelter explicitly asked her not to submit a document that she had not written or reviewed. We find that Respondent acted dishonestly when she submitted that report with the intent to mislead disciplinary authorities that Brammer-Hoelter had authored the report. We give this aggravating factor some weight.
Pattern of Misconduct – 9.22(c) : Because Respondent acted incompetently in varying degrees in the Carmichael, Shih, and Porter matters, we accord this factor some aggravating weight.
Multiple Offenses – 9.22(d) : Respondent represented clients incompetently, threatened to file a grievance to gain an advantage in a domestic relations matter, failed to consult with Salim's about its objectives for the representation, neglected to provide Salim's with a fee agreement, revealed client information, filed a frivolous and baseless lawsuit, delayed discovery, prejudiced the administration of justice, and knowingly falsified a rebuttal expert report in her disciplinary proceeding. Given these nine discrete types of offenses spanning four matters, we assign significant weight to this aggravator.
Submission of False Evidence During the Disciplinary Process – 9.22(f) : Respondent sent to the People and the PDJ a factitious expert rebuttal report under Brammer-Hoelter's name. Because we also assign weight to the dishonest conduct aggravator for the same misconduct, we accord this aggravating factor average weight.
Refusal to Acknowledge Wrongful Nature of Conduct – 9.22(g) : Save for her genuine expressions of remorse for her misconduct in the OARC matter, Respondent steadfastly refused to acknowledge the wrongful nature of any of her conduct. When invited to reflect on lessons she learned in the Carmichael and Shih matters, Respondent deflected, mentioning instead the mistakes of opposing counsel. And though she allowed that she was practicing outside her area of expertise in the Porter matter, she stood behind her conduct and insisted that she effectively represented Salim's. We give this average weight in aggravation.
Substantial Experience in the Practice of Law – 9.22(i) : We give this aggravating factor average weight. Respondent was licensed as a Colorado lawyer in 2005, and she practiced law in other jurisdictions before that.
Mitigating Factors Personal or Emotional Problems – 9.32(c) : Respondent presented the expert testimony of Dr. Charles Shuman, a psychiatrist. According to Dr. Shuman, Respondent's testing scored in the severe range for depression and post-traumatic stress disorder. Dr. Shuman acknowledged that Respondent was able to tell right from wrong at the time she submitted a falsified report under Brammer-Hoelter's name. Nonetheless, he opined, her decisions in the OARC matter were affected by her depression, stress, and anxiety. He explained that the disciplinary process caused Respondent to feel anxious, overwhelmed, and threatened; given her psychological profile, he said, she is prone to be highly emotionally reactive when she feels this way, particularly when she feels that her ability to practice law is jeopardized. Dr. Shuman stated that although the stress, depression, and anxiety Respondent experienced in February 2020 did not cause her misconduct in the OARC matter, these factors did lead her to act in a way that she may not have outside of the particular circumstances she faced. He thus recommended adoption of the personal and emotional problems mitigator.
The People's expert, Dr. Michael Gendel, largely echoed Dr. Shuman's conclusions. He agreed that Respondent suffers from anxiety and depression, though he did not necessarily concur as to the level of severity. He remarked that Respondent's impressive commitment to family law runs deep, and that protecting kids and families is a cornerstone of her commitment. When she perceived a threat to her ability to practice law, which is "dear to her heart," her desperation was understandable, he said. In Dr. Gendel's opinion, Respondent's anxiety about the situation could have contributed to her inability to "look down the road and think about consequences," but he was categoric that Respondent did not falsify the report because she was anxious or depressed.
Though neither expert opined Respondent's depression or anxiety was a direct cause of her misconduct, we agree with Dr. Shuman that Respondent is entitled to mitigating credit in recognition that her depression and anxiety about the disciplinary proceeding occluded her judgment. As a result, she panicked about missing the expert rebuttal report deadline and acted out of desperation. We opt to accord this factor above average weight.243 Character or Reputation – 9.32(g ) : Three of Respondent's former clients testified about her work for them as a domestic relations lawyer. All three described Respondent as an "angel" and effused about her commitment to their cases and her communication with them. Each former client recounted having recommended Respondent's legal services to other people. Respondent also subpoenaed retired Magistrate Peter Stapp, who testified that Respondent was always respectful, on time, prepared, and ready to take a stand for her clients. We are persuaded that Respondent is attuned to families who are needy and underserved, and that she represents her clients with true zeal and commitment. We give this mitigating factor substantial weight.
Imposition of Other Penalties or Sanctions – 9.32(k) : In the Porter case, Respondent was personally assessed thousands of dollars in attorney's fees for bringing a frivolous and groundless lawsuit. We assign average mitigating weight to this factor.
Remorse – 9.32(l) : We believe that Respondent is genuinely remorseful for her actions in the OARC case; she regrets misusing Brammer-Hoelter's name on the rebuttal report and mourns the resulting loss of that friendship. Respondent is entitled only to limited mitigating weight on this front.
Analysis Under ABA Standards and Case Law The Colorado Supreme Court has directed the Hearing Board to exercise discretion in imposing a sanction and to carefully apply aggravating and mitigating factors.244 We are mindful that "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases."245 Though prior cases are helpful by way of analogy, hearing boards must determine the appropriate sanction for a lawyer's misconduct on a case-by-case basis.246 Because Respondent's misconduct in the OARC matter carries the most severe presumptive sanction of disbarment, we focus our attention on that matter in this analysis. Nevertheless, we also take into account that in cases involving multiple types of lawyer misconduct, the ABA Standards recommend that the ultimate sanction should be at least consistent with, and generally greater than, the sanction for the most serious disciplinary violation.247 Lawyers are generally disbarred for submitting false evidence in disciplinary proceedings when they also submit the same false evidence in an underlying client matter or when they falsify evidence in order to conceal other misconduct. For instance, in People v. Goodman , a Colorado lawyer produced fabricated documents to opposing counsel in a civil lawsuit and testified to their authenticity during trial.248 Later, he presented the same fabricated documents to the People during their investigation.249 The Goodman hearing board concluded that the lawyer's misconduct in falsifying documents and making false statements warranted disbarment.250 Other Colorado hearing boards have imposed lengthy suspensions for falsifying documents outside of the disciplinary context. In People v. Lindquist , a hearing board suspended a lawyer for three years for intentionally altering an email that she submitted to the court as an exhibit in motions practice in her own divorce, relying on that exhibit to advance her argument, and later referencing the same altered exhibit in an appellate brief.251 The hearing board departed from the presumptive sanction of disbarment because the lawyer's misconduct took place not while she was furthering the interests of a client but rather at the end of a long and emotionally trying divorce in which she represented herself.252 A lawyer was also suspended for three years in People v. Ritland ; there, the lawyer circumvented the proper channels to adopt her second cousin's baby by falsely listing her own husband as the birth father on the baby's certificate, filing a petition for stepparent adoption in which she referred to her husband as the birth father, and counseling her husband to falsely aver that he was the baby's birth father.253 Though the presumptive sanction was disbarment, the hearing board in Ritland took into account that the lawyer was not representing clients during the misconduct, that she faced personal stressors that gave rise to atypical behavior, and that the mitigating factors were compelling.254 Here, whether to impose disbarment or a three-year suspension is a close question. Militating in favor of the former is the sheer range of the types of misconduct at issue in these four matters. Further, the gravamen of this consolidated matter is Respondent's fabrication of an expert report in her disciplinary case, which she submitted with the intent to deceive the People and the PDJ. Also weighing in favor of disbarment are the seven aggravating factors here, most notably Respondent's prior discipline; we are deeply troubled that she violated Colo. RPC 1.5(b) in the Porter matter while she was on probation in her prior disciplinary case for an identical offense. Indeed, Respondent's handling of the Porter matter in almost every respect dropped far below bare minimum standards of competence and professionalism. And her conduct in the Carmichael and Shih cases suggests a heedless disregard for court procedures and rules.
On the other side of the ledger, we consider the limited temporal scope of Respondent's deception and the minimal disruption to the proceeding that it occasioned. Respondent never concealed her deception from Brammer-Hoelter, and the People discovered the deceit almost immediately. The falsified expert report was very unlikely to have had any actual impact on the disciplinary case even if it were never brought to light, as we reckon that Respondent intended the rebuttal report to serve as a mere placeholder for a later submission. Perhaps more important, Respondent did not fabricate the expert report to conceal other misconduct. Nor did she engage in a protracted pattern of deceit spanning both an underlying case and her disciplinary proceeding, unlike the Goodman , Lindquist , and Ritland cases. Finally, Respondent did not commit the misconduct while representing a client. Rather—crediting the opinions of both Dr. Shuman and Dr. Gendel—she submitted the rebuttal report in desperation, feeling great stress from the pressures of defending herself against the disciplinary charges that threatened her law license.
In all, this case paints a picture of a zealous lawyer who esteems her clients above all else and who will go to any lengths to advance their legal interests, whether her maneuvers strictly comply with the Rules of Professional Conduct. Concomitantly, this case also paints a picture of a lawyer who has a low regard for her own profession and the legal system that she has sworn to uphold. Time and again, she sacrificed her duties as an officer of the court on the altar of her client's wishes. If her clients received adverse rulings, she blamed opposing counsel or claimed that the result was caused by "home cooking," denigrating the courts and the judicial system. And when she perceived that her law license—and thus her ability to protect her clients—was compromised, she became frantic and acted rashly by submitting false evidence in her own disciplinary proceeding.
When we consider this picture, taking into account the many claims both proved and unproved, the balance of aggravating and mitigating factors, the principles we draw from similar cases, and our own sense of fairness and proportionality, we conclude that the appropriate sanction here is a three-year suspension. With this sanction, Respondent must petition for reinstatement under C.R.C.P. 251.29(c), which will require her to prove by clear and convincing evidence that she is fit to practice law, has complied with all applicable disciplinary rules and orders, has been rehabilitated from her underlying misconduct. In our view, a necessary component of Respondent's proof of rehabilitation should include a showing that she has addressed her underlying mental health conditions with a meaningful course of counseling or therapy.
IV. CONCLUSION Lawyers are charged with maintaining the integrity of the justice system and the profession. This duty requires lawyers to abide by substantive, procedural, and ethical rules, to operate with candor and honesty in the legal process, and to promote the administration of justice by advancing only actions and claims that have a factual and legal basis. Respondent failed to honor those duties, instead elevating her fealty to her clients above her responsibilities to the justice system. We find that her misconduct warrants a three-year suspension.
V. ORDER The Hearing Board therefore ORDERS :
1. ANGELIQUE LAYTON , attorney registration number 36480 , will be SUSPENDED from the practice of law for THREE YEARS. The suspension will take effect upon issuance of an "Order and Notice of Suspension."255 2. Respondent SHALL promptly comply with C.R.C.P. 251.28(a)-(c), concerning winding up of affairs, notice to parties in pending matters, and notice to parties in litigation.
3. Within fourteen days of issuance of the "Order and Notice of Suspension," Respondent SHALL comply with C.R.C.P. 251.28(d), requiring an attorney to file an affidavit with the PDJ setting forth pending matters and attesting, inter alia , to notification of clients and other state and federal jurisdictions where the attorney is licensed.
4. The parties MUST file any posthearing motion on or before Friday, May 28, 2021 . Any response thereto MUST be filed within seven days.
5. The parties MUST file any application for stay pending appeal on or before Friday, June 4, 2021 . Any response thereto MUST be filed within seven days.
6. Respondent SHALL pay the costs of this proceeding. The People SHALL submit a statement of costs on or before Friday, May 28, 2021 . Any response challenging those costs MUST be filed within seven days.
/s/ James Brown JAMES BROWN
HEARING BOARD MEMBER
/s/ Margaret Cordova MARGARET CORDOVA
HEARING BOARD MEMBER
1 Ex. S1.
2 Ex. S2.
3 On March 22, 2021, the People filed a new set of redacted exhibits S1-S34. The earlier, unredacted exhibits S1-S34, filed on October 23, 2020, are now marked confidential.
4 At the hearing, Hunter was qualified as a family law expert, but she was not permitted to render expert opinions about civil procedure. Dr. Shuman was qualified as an expert in the area of psychiatry, and Dr. Gendel was qualified as an expert in the area of forensic psychiatry and treatment of addiction.
5 These findings of fact, which have been established by clear and convincing evidence, are drawn from testimony at the disciplinary hearing where not otherwise indicated.
6 See C.R.C.P. 251.1(b).
7 Ex. S1 ¶ 1; Ex. S2 ¶ 1.
8 See Ex. S3.
9 Ex. S5 at 5:16, Ex. S5 at 65:5.
10 Ex. S5 at 65:9-13.
11 Ex. S6 ¶¶ 3, 9 (written order issued July 20, 2017).
12 Ex. S3.
13 Ex. S7 ¶¶ 6, 9, 17.
14 Ex. S7 ¶¶ 18-19.
15 Ex. S8 at 924.
16 Ex. S8 at 925 (in granting the 14-day extension, the district court noted that Respondent had not requested a specific amount of time, nor had she yet ordered the transcript).
17 Ex. S9 at 934.
18 Ex. S9 at 935. On January 5, 2018, the district court clarified that its extension was granted up to and including December 22, 2017. See Ex. S27 at 898.
19 Ex. S10 ¶¶ 14-15.
20 Ex. S10 ¶ 18.
21 See Ex. S11.
22 See Ex. S180 (emails between Respondent and Carmichael concerning difficulties in scheduling the hearing).
23 Ex. S11 ¶ 10. Elsewhere, the motion stated that neither counsel was available on that date. Ex. S11 ¶ 5. Respondent was aware that Carmichael was in court on other matters on January 10, 2018. See Ex. S180.
24 Ex. S11 ¶ 4.
25 Ex. S12.
26 Ex. S13 at 210.
27 Ex. S13 at 129.
28 Ex. S13 at 130.
29 Ex. S14.
30 Ex. S13 at 131.
31 Ex. S180.
32 Ex. S13 at 131.
33 Ex. S13 at 132 (Carmichael also added, "perhaps you can get your client to sign the document I prepare (which [Father] will also sign) and we can file it tomorrow").
34 S15 at 4:13-15.
35 The court noted that each of the parties earlier filed an emergency motion to restrict parenting time, each of which were later converted to a motion to modify parenting time. Ex. S15 at 5:3-10.
36 Presumably the court was referring to C.R.S. § 14-10-129(1.5), which provides, "If a motion for a substantial modification of parenting time which also changes the party with whom the child resides a majority of the time has been filed, whether or not it has been granted, no subsequent motion may be filed within two years after disposition of the prior motion unless the court decides, on the basis of affidavits, that the child's present environment may endanger the child's physical health or significantly impair the child's emotional development."
37 Ex. S15 a5 7:21-24.
38 See also Ex. S68 at 480 (Respondent's response to the request for investigation stated, "Respondent was forced to speak with Ms. Carmichael's client because Ms. Carmichael failed to appear at a scheduled hearing without excuse."); Ex. S68 at 482 ("The Court on the record granted Respondent permission to speak with [Father]," concluding that "as the Court granted such permission ... Respondent was allowed to engage in the brief conversation that ensued, especially as [Father] initiated the conversation and Respondent immediately disengaged and returned to the Court room to seek judicial assistance as was attested to by [Mother]."); Ex. S68 at 483 ("The Court, on the record, at the conclusion of the hearing granted permission for the parties to speak. As Ms. Carmichael chose not to attend the hearing, even though her presence was required by the Court, she left Respondent no choice but to speak briefly with her client.").
39 Respondent's account is largely mirrored in Mother's notarized statement, which recounted, "Once we left the court room, [Father] immediately turned to me and said, ‘I didn't agree to anything. [C.E.] had better be returned to my house after school this afternoon.’ My attorney, [Respondent], said ‘no, no, no, this isn't what you said earlier, we are going back in to talk to the judge.’ He said, ‘I do not agree’ and started to walk away. Respondent and I walked back into the court room frantically and were told by the judge that the hearing was over and there was nothing else we could do. We left the courtroom and exited the building together, and had no further contact with [Father]." Ex. S28.
40 Kline has since been appointed as a municipal court judge in Thornton.
41 Exs. S29-S30, S33.
42 See also Ex. S68 at 482 (Respondent's rationale for seeking a protection order in Boulder).
43 Exs. S31-32.
44 See Ex. S13 at 214 ("what part of the above was not a settlement of this situation? How can you now go back on this? [C.E.] is now on the run again. I will be filing a complaint with the Bar Association and a Notice of Appeal of today[’s] order given the Judge's decision."); Ex. S13 at 130 ("Under CPC 4.1 were you truthful to me about your client's agreement to the stipulation?"); Ex. S13 at 214 ("Under Rule 4.1 CPC, did you misrepresent your consent to this agreement?"); Ex. S13 at 214 ("Under CPC 4.1 did you misrepresent your client's position to me?"); Ex. S13 at 214 ("CPC 8.4 - dishonesty and misrepresentation and fraud. How can you send me an email indicating that your client refuses to agree to the document you said you would prepare and have your client sign and that you knew I was relying on because I sent you an email saying I was relying on your representations.").
45 Ex. S16 at 77.
46 Ex. S13 at 214.
47 Ex. S13 at 215.
48 Ex. S16 at 78.
49 Ex. S16 at 79.
50 Ex. S16 at 79.
51 Ex. S16 at 83.
52 Ex. S16 at 83.
53 Ex. S16 at 85.
54 Ex. S16 at 86.
55 Ex. S17.
56 Ex. S3 at 3375.
57 Ex. S18. See also Ex. S20 (amended notice of appeal).
58 Ex. S27 at 906-07 ("The record here reflects that the magistrate first informed Mother on November 21 that she had thirty days to petition for review. Then, the district court consistently informed her on December 7 that she had fourteen days. Yet, inexplicably, Mother did not seek to clarify the extension until December 27."). See also Ex. S4 (appellate register of actions), Exs. S22-S26 (additional appellate filings and orders)
59 See Ex. S19 at 2:6-8.
60 Ex. S19 at 2:25.
61 Ex. S19 at 3:7-4:10.
62 Respondent also asked for appointment of a guardian ad litem. The court responded, "We don't appoint guardian ad litems. That's up to the Juvenile District Court." Ex. S19 at 6:15-16.
63 Ex. S21 at 126 (citing C.R.S. § 4-1-201 (b)(11) ).
64 See also Ex. S180 (Carmichael's email to court personnel that an earlier motion to restrict in the case was set well beyond the fourteen-day deadline).
65 Colo. RPC 1.1 cmt 5.
66 Compl. ¶ 69.
67 Ex. S68 at 483.
68 Accord In re Moore , 329 S.C. 294, 494 S.E.2d 804, 809 (1997) (finding a lawyer was incompetent by failing to serve a defendant within thirty days of filing a lawsuit, thereby risking dismissal of the case).
69 In re Olsen , 326 P.3d 1004, 1009 (Colo. 2014) ; see also Geoffrey C. Hazard, W. William Hodes & Peter R. Jarvis, The Law of Lawyering , § 30.12 (4th ed. 2015) (even under the objective standard, "some element of subjectivity remains," but discipline "should be imposed only if the lawyer persists in the error, or it is an error [not arising from] a single or simple mistake.").
70 Compl. ¶ 76.
71 Ex. S12.
72 See In re Discipline of Haderlie , 885 N.W.2d 78, 82 (N.D. 2016) (noting that conduct prejudicing the administration of justice generally relates to conduct that is connected with a judicial proceeding); In re Friedman, 23 P.3d 620, 628 (Alaska 2001) (finding no rule violation when a lawyer's conduct did not adversely affect litigation proceedings or a process fundamental to the administration of justice).
73 Ex. S71.
74 Ex. S69.
75 Ex. S72.
76 Ex. S73.
77 Ex. S75.
78 Ex. S77.
79 See Ex. S70 at 1760.
80 See, e.g. Ex. S74 (February 2016 email to Huffer inquiring about repeated engine removals and installations); Ex. S78 (March 2016 email to Huffer describing an attorney's fees statement Respondent intended to send to the court, with a courtesy copy to Porter; in early April 2016 she moved for attorney's fees, see Ex. S70 at 1759). Many of Respondent's updates to Huffer were peppered with snide asides about Porter, Bynum, and the judicial process. See Ex. S76 ("turns out after all their snotty emails to me about mediation today," she said, they "forgot to set it on the calendar"); Ex. S81 (forwarding to Huffer an invitation by Porter to settle the case, with the remark, "when you stop laughing you can throw this in the trash").
81 See Ex. S79 (March 2016 email from Respondent concerning disclosures and noting that she did not plan to call anyone other than Nehme to testify); Ex. S80 (factual statement).
82 Ex. S84 at 99:8-10.
83 Ex. S84 at 46:5-8. Southard appeared pursuant to a subpoena issued by Porter.
84 Ex. S83 at 111:15.
85 Respondent recommended an appeal despite Porter's warning that the cost of an appeal would exceed the amount of the judgment. Respondent replied, "there is no settling this case." Ex. S85.
86 Ex. S86.
87 Ex. S87.
88 Ex. S88.
89 Ex. S91.
90 See Ex. S90 (in a February 2017 email exchange about a settlement letter that Porter sent, Respondent asked Huffer, "I assume that I am free to tell them that we are not settling anything and we'll take it all the way to the Supreme Court if necessary," to which Huffer responded, "no settlement. We're in this for the long haul all the way up!" Respondent replied that she would "shit can" the letter); Ex. S92 (in a February 2017 email to Huffer, Respondent opined that "not unexpectedly" the district court affirmed "because these are judges who basically see each other in the hall"); Ex. S94 (in a March 2017 email, Respondent told Huffer the appeal outcome was expected: "Frankly, it is requesting that another judge who works possibly in the same office to determine that their colleague who sits right next to them and who passes them every single day in the hall made a critical error in interpreting the law. So the review was just a mandatory step on our way to our argument with the Court of Appeals.")
91 Ex. S95.
92 Ex. S96.
93 Ex. S98.
94 Ex. S97 at 1098.
95 Ex. S97 at 1097.
96 Ex. S97 at 1097.
97 Ex. S97 at 1097.
98 Ex. S99 at 1494.
99 Ex. S99 at 1494.
100 Ex. S99 at 1495 (Huffer excoriated Respondent for putting "us in a worse position," and noted that her reply left him "disgusted and underscores the worthlessness of ALL lawyers"); Ex. S99 at 1498 (Huffer berated Respondent that "Your ramblings of how the law works are of no help. Additionally, this has now become a financial hemorrhage and possible sanctions from opposing counsel because you ‘managed to delay it by filing numerous appeals’ ..."); Ex. S99 at 1518 (Huffer fumed, "I can tell you from experience working with you that it would not be successful because you are a failed lawyer that should not be practicing law. You are a danger.").
101 Ex. S99 at 1500.
102 Ex. S99 at 1508, 1518.
103 Ex. S100.
104 Ex. S101; see also Ex. S102 (May 31, 2017, email from Respondent to Huffer, apologizing for failing to complete the extension motion sooner, maintaining that she "didn't realize" the interrogatories were served so long ago, as the return of service was not filed until May 19, 2017).
105 Ex. S103; see also Ex. S106 (forwarding to Huffer an email from Porter requesting verified interrogatory responses and noting, "since Gus has a business he will always have a problem unless we figure out how to settle this"); Ex. S107 (responding to Porter, noting that the responses were not due until the end of July 2017).
106 See Ex. S104 (advising Huffer the best place to file a complaint against European was in district court, as "otherwise we could end up with the same judge that we had in County court again which I wouldn't want"); Ex. S105 (expressing hope that "we can get some kind of lawsuit going before [the creditor interrogatories] comes up as a problem for Gus").
107 Ex. S109 at 1431.
108 Ex. S109 at 1431.
109 Ex. S111.
110 Ex. S112. Respondent and Huffer also discussed service. Respondent contacted her usual process server, Jack Buck, asking him whether he knew someone in El Paso County "who can be a little intimidating who can serve a business complaint"; she later relayed to Huffer that "Jack told me he had a big scary dude that could go over and get this done today." Ex. S109 at 1434, 1436. Both Respondent and Buck testified at the disciplinary hearing that this was part of a longstanding joke between the two of them about service by "burly guys," but Huffer intimated that he took Respondent's statements seriously.
111 Ex. S114.
112 Ex. S113 at 1438.
113 Ex. S113 at 1438.
114 Ex. S113 at 1438-39.
115 Ex. S115.
116 Ex. S116. Porter also complained that he and Respondent could have easily agreed to a protective order to protect Salim's business information had she conferred before filing her motion. This was a theme Porter returned to several times thereafter, often noting that Respondent failed to confer before moving for relief. See, e.g. , Ex. S125 at 1150 n.1 (Porter's opposition to a motion for extension, noting that Respondent again made no efforts to confer, which he viewed as a "pattern of behavior").
117 Ex. S117. When Respondent told Huffer about the denial she said, "We could appeal it to the District Court and drag this out a bit, although who knows if the district court would just immediately deny it ..." Ex. S118.
118 Ex. S119 at 1544.
119 Ex. S120.
120 Ex. S121. Service of the contempt citation was defective, and Porter took steps to again serve the citation and reset the contempt hearing. See Exs. S127 & S129.
121 Ex. S122. Concerning Respondent's violation of C.R.C.P. 8(a)(3) Porter wrote, "This may seem petty but the prohibition was adopted in 1987 as part of the tort reform movement, for good reasons," explaining that the rule was intended to prevent parties from claiming huge damage figures in order to gain publicity or to prejudice the defending party. Ex. S122 at 1140.
122 Ex. S123 at 1549.
123 Ex. S123 at 1549.
124 Ex. S123 at 1550. A few weeks later, Respondent again expressed disquiet that "home cooking will come into play again," and that "this home cooking exposes Gus and me to liability for attorney's fees." Ex. S126.
125 Ex. S128.
126 Ex. S130. Noting that Respondent had not stated whether she conferred with Porter before moving for reconsideration, Judge Gilbert gave Porter a day to respond to Respondent's reconsideration request. See Ex. S133.
127 Ex. S132 (mislabeled as a reply to Porter's motion to dismiss).
128 Ex. S134.
129 Ex. S135. Respondent conferred with Huffer, not Nehme, about her withdrawal motion, telling him that she had been advised to withdraw "given your demand that I pay the judgment ..." Ex. S138 at 1558.
130 Ex. S136.
131 Ex. S137.
132 Ex. S139.
133 Ex. S140.
134 Ex. S145.
135 See also Ex. S141 (emails between Respondent and Huffer after she moved to withdraw).
136 See Ex. S150.
137 Ex. S143. See also Ex. S142 (Porter's unopposed motion to vacate contempt proceedings); Ex. S149 at 1602.
138 Ex. S149, Ex. S70 at 1754.
139 Ex. S144.
140 Ex. S144.
141 Ex. S151.
142 Ex. S152 at 1171.
143 Exs. S152 & S153.
144 Ex. S155.
145 Ex. S155.
146 Ex. S110 at 1836.
147 Ex. S157. A few days earlier, Porter had urged Respondent to resolve the issue before his fees ballooned any further. Ex. S156.
148 Ex. S158 at 1189.
149 Ex. S158 at 1189.
150 Ex. S159 at 1194.
151 Ex. S159 at 1198.
152 Ex. S160 at 1201.
153 Ex. S161 at 6:24-7:7. Respondent also told Judge Gilbert that she mostly dealt with Huffer and that she understood that Huffer was communicating with Nehme, Ex. S161 at 6:17-21, that she sent the complaint in the District Court Case to Nehme, Ex. S161 at 8:4-5, that had she realized before the trial that European had installed the motor she would have joined European, Ex. S161 at 12:13-17, and that Huffer had told her that he had made a substantial capital investment in Salim's, Ex. S161 at 58:13-16.
154 Ex. S162 at 1952.
155 Ex. S162 at 1952.
156 Ex. S164.
157 Ex. S165 at 3356.
158 Ex. S165 at 3360.
159 Ex. S110 at 1835.
160 See Cropper v. People , 251 P.3d 434, 438 (Colo. 2011) (noting that lawyers are expected to know the rules of procedure); see also In re Obert , 352 Or. 231, 282 P.3d 825, 839 (2012) (finding a lawyer acted without competence based on the lawyer's "ignorance of the most basic of applicable rules").
161 Colo. RPC 1.1 cmt. 5.
162 See Attorney Grievance Com'n of Maryland v. Gray , 436 Md. 513, 83 A.3d 786, 790 (2014) (finding that a lawyer violated the Maryland analog to Colo. RPC 1.1 when she failed to respond to discovery requests served by opposing counsel in a divorce case).
163 Ex. S162 at 1951.
164 See Compl. ¶ 216(i).
165 See, e.g., People v. Rivers , 933 P.2d 6, 7-8 (Colo. 1997) (finding that a lawyer failed to communicate with his client about whether the client desired ongoing representation after the client's girlfriend fired the lawyer); Fla. Bar v. Jasperson, 625 So. 2d 459, 460-61 (Fla. 1993) (finding that a lawyer deprived a husband of his right to make an informed decision when the lawyer, who was hired by a wife to handle a joint bankruptcy, never met with the husband yet prepared and filed the join petition). Further, because Respondent failed to confirm whether Huffer was authorized to act on Salim's behalf, she exposed Salim's to the risk of waiving the attorney-client privilege by funneling all communications through Huffer, a third-party.
166 The broad confidentiality provision of Colo. RPC 1.6 —which applies to all information related to the representation, regardless of its source—should be distinguished from the narrower attorney-client privilege, which applies only to communications between a lawyer and her client. See, e.g., Parler & Wobber v. Miles & Stockbridge, P.C., 359 Md. 671, 756 A.2d 526, 536 (Md. Ct. App. 2000).
167 See In re Anonymous , 654 N.E..2d 1128, 1129 (Ind. 1995) ; see also Lawyer Disciplinary Bd. v. McGraw , 194 W.Va. 788, 461 S.E.2d 850, 860 (1995) ("[t]he ethical duty of confidentiality is not nullified by the fact that the information is part of a public record or by the fact that someone else is privy to it").
168 See ABA Annotated Model Rules of Professional Conduct at 122 (8th ed. 2015 ("It is not necessary that the lawyer be named as a party to a proceeding in which the client of third party makes claims of wrongdoing on the part of the lawyer.").
169 See Colo. RPC 1.6 cmt. 10; In re Bryan , 275 Kan. 202, 61 P.3d 641, 655-56 (2003) (concluding that a lawyer's many disclosures of adverse information about his former client were not reasonably necessary to defend against the client's accusations that the lawyer was stalking her); Lawyer Disciplinary Bd. v. Farber , 200 W.Va. 185, 488 S.E.2d 460, 465 (1997) (finding that a lawyer's motion to withdraw and an attached affidavit went beyond the type of information appropriate to the termination of an attorney-client relationship).
170 Colo. RPC 3.1 cmt. 2.
171 See W. United Realty, Inc . v. Isaacs , 679 P.2d 1063, 1069 (Colo. 1984) (finding a claim to be substantially groundless if the allegations in the complaint, while sufficient to survive a motion to dismiss for failure to state a claim, are not supported by evidence in later stages of the proceeding).
172 See People v. Fitzgibbons, 909 P.2d 1098, 1104 (Colo. 1996) (finding the conclusions of the district court and court of appeals were evidence that the respondent's claims were frivolous and groundless).
173 Indeed, only after Porter moved to dismiss the complaint did Respondent express worry about its foundations, evidenced by her nervous emails to Huffer about "home cooking."
174 In line with our analysis of the claim alleging Colo. RPC 1.1 above, we do not find that the People proved paragraph 239 of the complaint, which alleges that Respondent filed a frivolous complaint in the District Court Case in part because she knew the County Court Case judge found no contract between Salim's and European.
175 Colo. RPC 3.3 cmt. 2.
176 Colo. RPC 3.4 cmt. 1.
177 Ex. S59 at 2435.
178 Ex. S37.
179 Ex. S38.
180 Ex. S39.
181 Ex. S40 at 2062.
182 Ex. S40 at 2064.
183 Ex. S40 at 2067.
184 Ex. S40 at 2069.
185 Ex. S40 at 2069.
186 Ex. S41 at 2107.
187 Ex. S41 at 2108.
188 Ex. S41 at 2107.
189 Ex. S43 at 2290.
190 Ex. S44.
191 Ex. S42.
192 Ex. S45.
193 Ex. S46.
194 Ex. S47.
195 Ex. S48.
196 Ex. S49 at 2578.
197 Ex. S51.
198 Ex. S50.
199 Ex. S52.
200 Ex. S36.
201 See Ex. S54.
202 Ex. S54.
203 Ex. S56.
204 Ex. S55 at 2152.
205 Ex. S55 at 2153.
206 Ex. S35 at 3390. Though a few allegations in the complaint, a couple of stipulated exhibits, and even some testimony address a discussion between Respondent and a potential witness before the hearing, no claims in the complaint are predicated on these allegations and thus we pretermit discussion of them.
207 Ex. S59.
208 Ex. S60 at 2704.
209 Ex. S60 at 2704.
210 Ex. S65.
211 Ex. S63.
212 Ex. S66.
213 Ex. S66.
214 Ex. S67.
215 See infra n.58.
216 See Ryan v. Ryan , 260 Mich.App. 315, 677 N.W.2d 899, 909 (2004) (filing a complaint without the required verification or supporting affidavits "calls into question the competence and good faith of the plaintiff's attorney").
217 See Ex. 68 at 498 (Respondent's response to the request for investigation states, "Mr. Shih filed 4 Motions to Dismiss, 2 Motions for Contempt, and a Motion for Sanctions. There were 64 entries in the Court file, and the case had not progressed beyond a scheduling a hearing to determine whether venue was proper. All motions referenced above were resolved in Respondent's or her client's favor.").
218 See Ex. S182.
219 Ex. S167 at 574.
220 Ex. S168 at 259.
221 Ex. S169.
222 Ex. S171.
223 Ex. S172.
224 Ex. S170.
225 Ex. S170.
226 Exs. S170, S173-S174.
227 Ex. S175.
228 Ex. S176.
229 Ex. S177.
230 Ex. S176.
231 Ex. S178.
232 Ex. S179.
233 The People brought five claims in case number 20PDJ030 but dismissed Claims I and II before the hearing.
234 See Colo. RPC 1.0 cmt 7A ("[W]here a Rule of Professional Conduct specifically requires the mental state of ‘knowledge,’ recklessness will not be sufficient to establish a violation of that Rule ....").
235 Ex. S174.
236 People v. Clark , 927 P.2d 838, 840 (Colo. 1996) (citing People v. Rader , 822 P.2d 950, 953 (Colo. 1992) ).
237 Rader , 822 P.2d at 953 (internal quotes omitted).
238 We decline to accept Respondent's invitation to take a position on the People's prosecutorial strategy. Although tribunals generally favor streamlined complaints, the practice of which Respondent disapproves nevertheless has precedent. See, e.g. , People v. Reed , 955 P.2d 65, 67-68 (Colo. 1998) (finding a lawyer violated Colo. RPC 3.3(a)(1) and Colo. RPC 8.4(c) by signing the name of substituted counsel on pleadings in a handwriting that differed from his own so as to conceal his conduct); see also People v. Mason , 938 P.2d 133, 137 (Colo. 1997) (finding a lawyer violated Colo. RPC 3.3(a)(2), Colo. RPC 4.1(b), and Colo. RPC 8.4(c) by failing to disclose his ownership claim in a cabin that was the subject of a dispute between his client and a bank).
239 Found in ABA Annotated Standards for Imposing Lawyer Sanctions (2d ed. 2019).
240 See In re Roose, 69 P.3d 43, 46-47 (Colo. 2003), as modified on denial of reh'g (May 12, 2003).
241 In re Pautler , 47 P.3d 1175, 1179 (Colo. 2002) ; see also In re Cleaver-Bascombe , 986 A.2d 1191, 1200 (D.C. 2010) ("Lawyers have a greater duty than ordinary citizens to be scrupulously honest at all times, for honesty is "basic" to the practice of law. ... Every lawyer has a duty to foster respect for the law, and any act by a lawyer which shows disrespect for the law tarnishes the entire profession.") (citations omitted); Lawyer Disciplinary Bd. v. Grindo , 243 W.Va. 130, 842 S.E.2d 683, 695 (2020) ("Respect for our profession is diminished with every deceitful act of lawyer.") (citations and quotations omitted).
242 See ABA Standards 9.21 and 9.31.
243 Cf. In re Cimino , 3 P.3d 398, 402 (Colo. 2000) (declining to accord mitigating weight to personal and emotional problems where no evidence showed that the personal problems "did not cause or even affect the onset of the misconduct").
244 See In re Attorney F. , 2012 CO 57, ¶ 19, 285 P.3d 322 ; In re Fischer , 89 P.3d 817, 822 (Colo. 2004) (finding that a hearing board had overemphasized the presumptive sanction and undervalued the importance of mitigating factors in determining the needs of the public).
245 In re Attorney F. , ¶ 20 (quoting In re Rosen , 198 P.3d 116, 121 (Colo. 2008) ).
246 Id. ¶ 15.
247 ABA Annotated Standards Preface at xx.
248 People v. Goodman , 334 P.3d 241, 246 (Colo. O.P.D.J. 2014).
249 Id.
250 Id. at 251 ; see also In re White , 11 A.3d 1226, 1232 (D.C. 2011) (disbarring a lawyer after she presented fabricated documents in a whistleblower investigation and later in a disciplinary proceeding, during which she testified falsely to events that never took place); In re Whitt , 149 Wash.2d 707, 72 P.3d 173, 180 (2003) (noting that "[f]alsifying information during an attorney discipline proceeding is one of the most egregious charges that can be leveled against an attorney," and disbarring the respondent lawyer for making false representations and submitting fabricated documents during the disciplinary process to conceal her failure to act diligently on her client's behalf, to adequately communicate, to abide by her client's directives, and to be honest about the status of her client's case).
251 470 P.3d 961, 972-73 (Colo. O.P.D.J. 2016).
252 Id. at 977.
253 327 P.3d 914, 921 (Colo. O.P.D.J. 2014).
254 Id. at 926-27, 929 ; see also In re Fioramonti , 176 Ariz. 182, 859 P.2d 1315 (1993) (applying disbarment presumptive standards but imposing a three-year suspension in recognition that a lawyer's fabrication of false evidence during his disciplinary proceeding took place during one series of events, that the lawyer enjoyed a good reputation, and that the lawyer had practiced for a long period of time with no prior discipline).
255 In general, an order and notice of sanction will issue thirty-five days after a decision is entered under C.R.C.P. 251.19(b). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.